THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT GREEN, Defendant-Appellant.

First District (5th Division)   No. 82—1315

Opinion filed September 23, 1983.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and James J. Bigoness, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and concealment of a homicidal death and sentenced to concurrent terms of 65 and 10 years. On appeal, he contends that (1) his sixth amendment right to cross-examine and impeach the State's key witness was erro-

neously limited; (2) restriction of his attempts to rehabilitate his sole witness constituted reversible error; (3) he was denied a fair trial as a result of the prosecutor's inflammatory comments in closing argument; and (4) the imposition of extended terms was improper.

At trial, Officer Barker testified that on October 21, 1981, during a neighborhood search for a missing child, he found the body of 13-month-old Steven Jones inside a green plastic trash bag in a garbage can. Laboratory tests run on the bag in which the body was found produced no identifiable fingerprints.

Dr. Robert J. Stein, who performed an autopsy, described various bruises, abrasions, and contusions to the head, face, and neck, but stated that there was no sign of significant external bleeding. He concluded that the cause of death was ligature strangulation in association with subdural hematoma. The witness stated that it was unlikely that any of the injuries could have been caused by an object, such as an iron, falling from a distance of five feet.

Steven Smith, the baby's father, testified that when he last had the child for a visit, October 11, 1981, he noticed a bruise on the infant's back. When shown photographs of the dead child, Smith stated that he had seen none of the injuries shown in them at the time of the baby's last visit with him.

Dorothy Jones, the baby's grandmother, who lived down the hallway from her daughter and defendant, testified that on October 20, 1981, she babysat for Steven in her apartment until 5:30 p.m., when her son Thomas took Steven back to defendant's apartment. She observed no indication of injury to the baby that day. On cross-examination, she stated that defendant treated her, Aleisa and the baby with respect and that she never saw nor heard of him mistreating the child.

Thomas Jones, the 15-year-old uncle of Steven, testified that he took the baby back to defendant's apartment at approximately 5:30 p.m. and that, as he was leaving, he heard defendant tell the baby, who was crying, to "shut up and lay down."

Roxanna Hoskins testified that she had spent the afternoon at defendant's apartment where she, Aleisa, defendant, and Willie Green drank beer and vodka and smoked marijuana. She and Aleisa had also taken sleeping pills, and when she left at 5:45 p.m., Aleisa was sleeping on the couch. At approximately 6:30 p.m., Roxanne returned to defendant's apartment but received no response to her knocking. On cross-examination, she stated that she had not heard defendant tell the baby to shut up.

Aleisa Jones (Aleisa), Steven's mother, corroborated the testimony

of Roxanna Hoskins concerning the events of that afternoon and also stated that sometime after she fell asleep, defendant woke her to tell her the baby was back. She saw the infant lying on some pillows on the floor next to the couch. She did not hear him or see him move. Still later, defendant woke her a second time and told her that Steven had pulled an iron down from the cabinet onto his head but was "okay" and that he (defendant) had put a cold towel on the bump. Aleisa saw the baby lying in the same position as he had been in the first time she woke up; he was neither moving nor crying. Defendant awakened her a third time and asked whether she had taken the baby to her mother's house. Aleisa got up, and when she couldn't find the child she called the police.

On cross-examination, Aleisa stated that defendant had treated her and the baby well, had never abused either of them, and had only slapped the child once, on his hands, as a disciplinary action. She also stated that earlier in the afternoon, she had seen defendant and Willie Green fighting in front of the building and that once inside the apartment, they continued to argue but did not exchange blows. After telling them to "take it outside," Willie left and she did not see him again until after the police arrived later that night.

Willie Green (Willie), defendant's brother, testified for the State that he lived in the same building as defendant and that after Aleisa told them to take their argument outside, he returned to his apartment where he stayed until about 6:45 p.m. At that time, defendant came to his door and told him to come downstairs to smoke some "reefers." When he arrived there, defendant opened the door and "passed me a plastic bag, garbage bag, and he said to take the bag to the garbage, not in the back of the building, away from the building on the other side." The bag was green plastic and tied into a knot. Defendant did not tell him what was inside, and as he went down the front stairs, he met Maybell Stewart, with whom he conversed for two or three minutes. He then took the bag and set it in a can approximately 30 feet down the alley. On his return, as he approached defendant's apartment, he saw the door closed and when he heard a loud argument inside he returned to his own apartment. A few hours later, Aleisa's brother Thomas told him that the baby was missing and that the police were there. Willie went downstairs to defendant's apartment, and when he asked him, "What was in the bag?" defendant responded, "The baby. Shush, don't say nothin'." On two prior occasions, Willie had seen defendant mistreat the baby. Once, defendant threw the baby to the floor, saying "Shut up you mother-_____."
The other time, defendant kicked the baby in the head, saying "I hate

this mother-_____. He looks just like his damn daddy."

On cross-examination, Willie denied that he disliked his brother and stated that he loved him despite the fact that they argued and fought often. On October 20, 1981, he and defendant had fought because he (Willie) told their sister about defendant abusing Steven.

Willie also testified that while the police were at defendant's apartment that night, he did not tell them defendant had given him a bag to put in the garbage or that defendant later told him what was inside the bag. The following day he was arrested, taken to a police station, and told he was a suspect in this case. Although he denied being told that he could be charged with murder or that he was worried about being so charged, he was impeached by his preliminary hearing testimony to the contrary. Defense counsel also attempted to question Willie as to whether he was actually charged with murder and whether he was booked and fingerprinted prior to making the statement which implicated his brother, but the court sustained the State's objections to this line of questioning on the grounds that there was no indictment or information against Willie. He then admitted that he was handcuffed to a wall for six hours, questioned at least three different times by two teams of detectives, transported to three different police stations, and that after taking a lie detector test the police told him he was hiding something and placed him in a lockup. The next morning, he summoned detectives and gave a written statement in which he told them that defendant had given him the bag and later told him the baby was inside the bag.

Willie could not recall the days or dates of the two incidents when he had seen defendant abuse the baby and admitted that no one else had been present. When defense counsel attempted to question Willie as to whether he mentioned both incidents in his statement, the court sustained an objection on the basis that it was not proper impeachment by omission since the written statement was in question and answer form and the witness could not be impeached by something which had not been asked of him.

On redirect examination, Willie testified that he was never charged with murder in this case but that, while in custody, he was worried about being charged with concealing information, and that the reason he withheld information was to protect his brother.

The State's final witness was Maybell Stewart, who testified that shortly after 7 p.m. on October 20, 1981, she met Willie Green on the front stairs of his apartment building where she talked with him for a few minutes. He was carrying a closed, green plastic trash bag and seemed his "usual self." As she left, she saw him walk toward the al-

ley with the bag.

The defense presented only one witness—Bertha Jones—sister of both defendant and Willie Green, who testified that Willie never told her that defendant mistreated the baby. She also stated that during a telephone conversation with an assistant State's Attorney, she told him that Willie had never spoken to her about the abuse incidents and she was not told that someone else was on the telephone line at that time. Sometime later, he called her again, and she reiterated that Willie had never told her that defendant had mistreated Steven.

On cross-examination, Bertha admitted that she had spoken to Aleisa in the hallway of the courthouse during the trial but denied that defendant had asked her to do so. She also denied saying, during the telephone conversation with the assistant State's Attorney, that Willie may have said something about defendant mistreating the baby or that she tried to dissuade Willie from testifying by telling him that his testimony would send defendant to prison. Defense counsel's objections to these questions were overruled.

On redirect examination, when defense counsel tried to question Bertha about her conversation with Aleisa in the courthouse hallway during the trial, the State's objection on hearsay grounds was sustained.

On rebuttal, Investigator Ragonese testified that he was on the telephone line when the assistant State's Attorney spoke with Bertha Jones, who, when asked whether Willie had ever told her about defendant abusing the baby, said she couldn't remember because she had a bad memory but that he "might have." Ragonese admitted, however, that he did not take notes while listening to this conversation and that he was relying on his recollection.

## Opinion

■ Defendant first contends that erroneous rulings restricting the cross-examination and impeachment of Willie Green, the State's key witness, violated his sixth amendment rights and denied him a fair trial.

He argues that this was a case based solely on circumstantial evidence and, in view of Willie's original status as a prime suspect, the trial court erred in not permitting him to cross-examine Willie concerning the fact that he had been fingerprinted and photographed before giving a statement implicating him (defendant).

It is well settled that cross-examination is a matter of right (*People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135), and showing a witness' bias, interest, or motives for testifying falsely is

an accepted method of impeachment (*People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382). The accused may question a witness concerning any matters which would explain, modify, or discredit his direct testimony (*People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708), and the fact that a witness has been arrested or charged with a crime may be inquired into where it would reasonably tend to raise inferences that his testimony was influenced by pressures, either real or imagined, from the authorities (*People v. Baptiste* (1976), 37 Ill. App. 3d 808, 347 N.E.2d 92); however, a determination as to the manner and scope of cross-examination rests largely in the discretion of the trial court (*People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694), and absent a clear abuse of discretion resulting in manifest prejudice to the defendant, a reviewing court will not interfere with the trial court's exercise thereof (*People v. Jones* (1979), 70 Ill. App. 3d 338, 387 N.E.2d 1010).

Here, the only questions not allowed were those concerning whether he had been photographed and fingerprinted prior to giving the implicating statement, and defendant argues that he should have been permitted to show through this questioning that Willie had a motive to give a false statement implicating defendant because he thought he might be charged with murder. However, considering Willie's admission at the preliminary hearing that the police had told him he could be charged with murder, and testimony at trial that (a) he had been arrested, handcuffed to a wall for six hours, interrogated repeatedly, subjected to a lie detector test, and then placed in a lockup; and (b) he was worried about being charged with concealment of information, it appears that the jury knew that he was a suspect at the time he gave the statement, and thus we are of the belief that the refusal to allow the defense to bring out that he had been fingerprinted and photographed before giving the statement did not prejudice defendant.

■ Defendant also urges that under the doctrine of impeachment by omission, he should have been allowed to cross-examine Willie concerning the fact that in his statement Willie mentioned only one incident of violence by defendant against Steven in order to discredit Willie's direct testimony and that he had witnessed two incidents of such violence.

A witness' failure to state a particular fact under circumstances rendering it natural or probable that he would state such fact, if true, may be shown to discredit his testimony as to the fact. (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.) Here, the written statement to which defendant refers was in question and answer form. Af-

ter Willie stated, in response to the question of the assistant State's Attorney that he had seen defendant hurt the baby before, he was asked, "And approximately how long ago was that incident?" Defendant answered, "About two weeks," and he was not asked whether there was more than one incident. Under such circumstances in a question and answer statement, we do not believe that it would have been natural or probable for Willie to respond with information concerning a second incident about which he was not questioned.

Defendant next contends that he was denied a fair trial because he was twice restricted in attempts to rehabilitate Bertha Jones, his sole witness. The first instance concerned the State's questioning of Bertha on cross-examination, as follows:

"Q: Have you spoken to Alicia [sic] on his [defendant's] behalf?

A: Well I talked to her the other day when she was out there in the hallway.

Q: Well, didn't Robert [defendant] ask you to talk to her?

A: No, he didn't.

DEFENDANT GREEN: No I didn't."

On redirect, the following colloquy took place:

"Q: The State's Attorney asked you if you ever talked to Alicia, Alicia [sic] Jones, is that correct?

A: Right.

Q: You have said that you talked to Alicia [sic] Jones out in the hallway?

A: For a few minutes.

Q: Tell the ladies and gentlemen of the jury what Alicia [sic] Jones said to you when you talked to her."

When an objection to that question on grounds of hearsay was sustained, defense counsel asked no further questions of this witness and made no offer of proof as to what he believed the witness would have said in response to his question. An offer of proof is necessary where there is no other satisfactory indication as to the substance of evidence (*Lewis v. Beckman* (1978), 57 Ill. App. 3d 482, 373 N.E.2d 589), and the failure to do so is a waiver of any error in the exclusion of testimony (*People v. Gordon* (1980), 82 Ill. App. 3d 906, 403 N.E.2d 570).

Here, there was no offer of proof, and because the substance of what the witness would have answered is not otherwise indicated in the record, we are unable to determine whether defendant was prejudiced by the court's ruling.

Defendant also asserts that the State improperly implied,

without proof thereof, that defense witness Bertha Jones made prior inconsistent statements. The prosecutor asked her whether she had tried to dissuade Willie from testifying and whether she had told him that his testimony could send defendant to prison. She denied doing so, and the State thereafter did not offer evidence of those statements. Interrogation of this type which creates an innuendo unsupported by evidence is improper (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161), and where it concerns a principal issue could be reversible error as being clearly prejudicial (*People v. Morris* (1979), 79 Ill. App. 3d 318, 398 N.E.2d 38), (an alleged confession). Here, however, the insinuations involved only collateral matter, which we do not believe could have contributed to the verdict of the jury and was not reversible error.

■ Defendant next contends that certain comments by the prosecutor during closing argument denied him a fair trial. Prosecutors may not resort to unfounded or inflammatory closing remarks (*People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301) and, recently, we have been examining improper prosecutorial conduct with vigorous growing concern (see *People v. Guyon* (1983), 117 Ill. App. 3d 522). We note, however, that questions concerning such comments must be decided on the facts of each case (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880), and in general, improper prosecutorial remarks "do not constitute reversible error unless they result in substantial prejudice to the accused" (*People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200, 1205).

In asserting substantial prejudice, defendant first points to the following statement made by the prosecutor in final argument:

"Reasonable doubt is not an impossible burden, it's a burden which we accept and we accept proudly. The people in this building are convicted of crimes beyond a reasonable doubt every day, a dozen or two dozen times a day, hundreds of times a week in this State and most of those cases come from this building. Our prisons are overflowing with people convicted beyond a reasonable doubt. It is not an impossible burden."

Defendant argues that this statement improperly diluted the State's burden of proof. While much of the quoted comment lacked record support and was thus improper, we note that it was held in *Bryant* that the prosecutor's characterization of the State's burden as "not unreasonable" and "one that is met every day" did not reduce the State's burden of proof. So also, here, in the light of the overwhelming evidence against defendant and the fact that the jury was properly instructed not only as to the State's burden of proof but also that

statements of counsel were to be disregarded if not based on the evidence, we do not believe that the remarks in question resulted in substantial prejudice to defendant.

■ Defendant also urges that the prosecutor's references to him as "depraved" and "animal" and "the lowest form of human being" were inflammatory and prejudicial, having only the purpose of arousing the passion and hostility of the jury. We initially note that because defendant did not object to these comments and failed to raise any question concerning them in his post-trial motion, he has waived any impropriety for purposes of review. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.) Moreover, the language in question was used in context as follows: "[P]icture him [defendant] as he really is, the violent depraved baby killer that he really is," and "there is no lower form of human being," and "only a vicious animal is capable of doing to that child what was done." Each of the comments was used in argument only once and, in view of the fact that the victim was the 13-month-old baby with evidence that defendant prior to the day of the homicide had thrown him to the floor and kicked him in the head; that the autopsy revealed numerous abrasions and contusions to the head, face, and neck; that the cause of death was ligature strangulation associated with subdural hematoma; and that the body was disposed of by placing it in a garbage can, it appears that the remarks were supported by the record and, in any event, in view of the overwhelming evidence of guilt,. we do not believe that they had any bearing on the jury's verdict.

■ Turning then to the contention of defendant that extended-term sentences were improperly imposed, we initially note that section 5—5—3.2(b)(3)(i) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(3)(i)) provides that an extended-term sentence may be imposed when a defendant is convicted of a felony committed against a person under 12 years of age at the time of the offense. The victim here was a 13-month-old child.

However, we agree with defendant that the extended-term sentence for the offense of concealment of a homicidal death was impermissible. In *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, our supreme court held it to be clear from the plain language of the statutes involved that an extended sentence should be imposed only on the most serious offense for which a defendant was convicted. See also *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 428 N.E.2d 937, which followed *Evans*.

The State, however, urges us to reject the holdings in *Evans* and *Walsh* and accept the statutory interpretation of *People v. Mims* (1982),

111 Ill. App. 3d 814, 444 N.E.2d 684. *Mims,* relying upon an opinion in *People v. Williams* (April 16, 1982, No. 51870) (*Williams I*), found that extended-term sentences may be imposed in appropriate circumstances for different classes of offenses, even in those situations when the offenses are not the most serious for which an offender is convicted. It appears, however, that the opinion in *Williams I* was withdrawn when a rehearing was allowed in that case, and in the opinion subsequently filed (*People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136 (*Williams II*), no reference was made to the propriety of the extended sentences. Disagreeing with *Mims,* this court subsequently, in *People v. Rowe* (1983), 115 Ill. App. 3d 322, 329, 450 N.E.2d 804, 810, found that "[t]here is no language in the statute that authorizes an extended-term sentence for the class of the lesser offense of which defendant was convicted." Since *Williams I* was withdrawn after the rehearing was granted, it cannot serve as a precedent (*Tallman v. Eastern Illinois & Peoria R.R. Co.* (1942), 379 Ill. 441, 449, 41 N.E.2d 537, 541), and because *Williams II* makes no reference to the extended-term sentence issue, it is our view that the reasoning of *Evans, Walsh,* and *Rowe* should be followed.

For the reasons stated, the conviction and sentence for murder is affirmed; the conviction for concealment of a homicidal death is affirmed, but the sentence thereon is reduced to a term of five years, the maximum permitted for the offense, which is a Class 3 felony.

Affirmed as modified.

WILSON, P.J. and LORENZ, J., concur.