THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE MITCHELL, Defendant-Appellant.

First District (2nd Division)   No. 85—1434

Opinion filed October 27, 1987.—Rehearing denied January 5, 1987.

60

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Maurice Mitchell was charged by information with the murder of his wife Debra Mitchell, and with armed violence. Following a jury trial, Maurice was convicted of murder and he received a 40-year sentence, from which he appeals. We affirm.

During *voir dire*, Maurice made two motions for a mistrial based on the following grounds: (1) that the People systematically excluded blacks from the jury; and (2) that the trial judge denied a defense request "that the jurors be asked whether they belong to any organizations dealing with social services for women and children."

After the jury was selected, the People agreed not to "bring out any conversations that go towards the incidents that may have occurred between the defendant and the victim either before the death of Deborah [*sic*] Mitchell or immediately thereafter; but we will reserve the right to use this in rebuttal, all of the conversations." Additionally, the trial court allowed the defense's motion *in limine* to bar the People from introducing evidence of an altercation on May 11, 1983, between Maurice and Debra, although the defense was permitted to bring out the details of the incident in order to "show bias."

Andrew Coats, Debra's father, testified that although on Decem-

ber 3, 1983, Debra was married to Maurice, she lived separately from her husband, at Coats' apartment, and had done so since an incident occurred between Debra and Maurice on May 11, 1983. On December 3, 1983, at 1:30 a.m., Coats was watching television in his bedroom when Debra and Maurice entered the apartment. Coats returned to his bedroom with Debra, who was crying. Meanwhile, Maurice was sitting in the kitchen. At this time, Maurice said to Debra, "This is going to be your last night." Coats told the couple that he did not want to hear any arguments between them because he had a headache, and that they should go to bed. When Debra left her father's bedroom on the way to her bedroom, she passed through the kitchen. Coats testified that Maurice said to Debra, "I'm not kidding you. This is going to be your last night." Debra and Maurice then went to her bedroom.

While they were in the bedroom, Coats heard no voices, but he did hear the sound of bedsprings. Moments later, Maurice came to Coats' bedroom and said: "You better go see your daughter, I think she done cut herself." As Coats watched Maurice leave the apartment, his daughter, who was bleeding profusely, stumbled into the kitchen and fell to the floor. The trial continued as follows:

"MR. FRANKS [Assistant State's Attorney]: Have you ever seen the defendant with a knife?

A. Yes, I seen him with a knife.

MR. LEMONS [Assistant Public Defender]: Objection.

THE COURT: Sustained.

Q. Well, have you ever seen the defendant with a pouch on his belt?

A. Yes, I did.

MR. LEMONS: Objection.

THE COURT: Sustained."

During cross-examination, Coats testified that he did not see Maurice with a knife on the night of the killing, and he denied that he took a knife from Debra immediately prior to her death. He also denied that two days after Debra's funeral he told Kathy Mitchell, Maurice's sister, that he had taken a knife from Debra. Finally, he denied telling his friend Josh a few days later at a gas station that he did not know what had happened to his daughter because he was on medication. During redirect examination, the following occurred:

"Q. Now, this gas station that was mentioned at Roosevelt and Keeler, did you ever see or hear what the defendant's connection was to that gas station? Did he ever do anything around that gas station?

A. They hit a couple guys, what I heard.

MR. LEMONS: Objection.

THE COURT: Sustained. The jury will disregard that."

Officer Patricia Warner of the Chicago police department testified that she investigated the scene of the crime on December 3, 1983. She noticed that Debra had a long gash on her neck and a wound on the back of her right hand, but no weapon was found.

Shirley Ivy, Maurice's girlfriend for two years, was the next witness. A defense objection was sustained when the prosecution asked if Ivy had ever observed Maurice carrying a weapon. On December 3, 1983, at 3 a.m., Maurice came to Ivy's house and asked her to take him to the bus station. While he was waiting for Ivy to get ready to leave, Maurice pulled a black folding knife out of his pants and wiped it on them.

Ivy then drove Maurice to the bus station, where he bought a ticket to Detroit. She testified that during the drive to the station, Maurice again displayed the knife, and told her that he had been in a fight with Debra's brother and two other people, one of whom had a gun. Therefore, he took the gun and shot all three of them, after which Debra came at him with a knife and cut herself. At the station, Maurice told Ivy that he cut Debra and killed her during a fight. During cross-examination, Ivy testified that she called the police about the case on December 5, 1983, and on December 7, 1983.

Prior to the testimony of Debra's mother, Susie Coats, the trial court reiterated that the motion barring evidence of prior altercations between Maurice and Debra remained in effect. During Susie Coats' testimony the following exchange occurred:

"Q. When was the last time you saw your daughter alive?

A. It was Thanksgiving of '83.

Q. And what was her condition at that time?

A. Well she seemed very nervous and tense, and she had—

MR. RHODES: Objection.

THE COURT: Sustained. The jury will disregard that.

Q. Did she have any bruises on or about her person at that time?

MR. RHODES: Objection.

A. She had a bruise on her face.

THE COURT: Sustained.

A. What she said that Maurice—

THE COURT: Sustained. Ma'am, don't say another word. Objection sustained. The jury will disregard."

A subsequent motion for a mistrial due to this exchange was over-

ruled by the trial judge.

Officer Peter McManamon of the Chicago police department testified that he investigated the scene on the morning of December 3, 1983, and he recounted the statements Coats made to him. The following ensued:

"Q. Now, you indicated that the defendant and Debra were constantly arguing?

MR. RHODES: Objection.

THE COURT: Sustained.

Q. Was there any discussion about the constant arguing in terms of past history?

MR. RHODES: Objection. Your Honor, may I be heard?

THE COURT: Sustained.

\* \* \*

Q. Did the witness, Andrew Coats, say that Debra Mitchell had said anything that night?

MR. RHODES: Objection.

THE COURT: Sustained.

Q. Did Andrew Coats say what Debra Mitchell had done during the course of the incident?

MR. RHODES: Objection, your Honor.

THE COURT: Sustained."

Dr. Tae An testified that her autopsy of Debra revealed that she had a laceration from the left side to the right side of her throat, which severed the jugular vein and lacerated the larynx. She also discovered a wound on the back of Debra's right hand.

The initial defense witness was toxicologist Michael Schaffer, who testified that an examination of Debra's blood for alcohol was positive for 300 milligrams percent ethanol. Schaffer stated that the standard for intoxication in driving cases in Illinois is 100 milligrams percent ethanol.

Coats' friend Curtis Connors testified that he knew Kathy, Maurice, Coats, and Josh. At a gas station in December of 1983, he heard Coats tell Josh that he did not know what had happened to his daughter that night because he was asleep. Moreover, that same day Connors told Kathy about the gas station conversation.

Maurice testified that he spent most of December 2, 1983, with Debra, and that they drank bourbon throughout the day. Maurice stated that Debra drank a lot, and they fought only when she was drunk. For example, Maurice testified that in June of 1983, Debra attacked a woman named Lala with a steak knife after accusing Maurice of spending the night with Lala. Maurice stepped between

them and Debra struck him in the arm. In August of 1983, Debra attacked a woman named Lenora with a knife. When Maurice stepped between them, he was cut by Debra. On both occasions, Debra hd been drinking.

On their way home to Debra's house on December 3, 1983, Maurice and Debra stopped at a bar for more to drink. When Maurice wanted to leave, Debra became angry because she wanted to stay. Maurice testified that they went to Coats' house, and when Maurice announced that he was leaving, Debra picked up a butcher knife and said, "You're fixing to go to one of your B's house [sic]." Coats disarmed her and said he did not want to hear any arguing. Maurice then testified that his statement to Debra that it was her last night meant that he would not take her out anymore. Coats asked them to go to bed, and returned to his bedroom.

Maurice testified that he went to the bathroom and upon exiting it, Debra came at him with a knife. Maurice grabbed the knife and the pair fell on the bed. While Maurice tried to take the knife away from Debra, she tried to kick him in his "privates," but instead cut herself. Maurice left the bedroom and woke Coats to tell him to check on Debra. Maurice went to the gas station to call the police, but when he thought he saw Debra's brother, he dropped the telephone and ran to Ivy's house. He testified that he did not have a knife at that time. When he arrived at the house, he asked Ivy to take him to the bus station. He testified that he left town because he feared Debra's brother. Ivy drove him to the bus station, where he bought a ticket to Detroit. Maurice testified that before being arrested in Detroit, he had attempted to make arrangements to surrender.

In cross-examination, Maurice stated that during arguments with Debra the two years immediately preceding her death he bit her, hit her in the mouth, slapped her, and knocked her down. On the night of the killing, Maurice owned a folding knife, and although Debra attacked him with a folding knife, he claimed that it was not his knife. Maurice testified that he tried to twist Debra's wrist to make her drop the knife, and she died by accident.

During a sidebar, the trial court ruled that the People could not cross-examine Maurice concerning death threats he allegedly made toward Debra in 1983. Shortly thereafter, the following occurred:

"Q. Did you tell Shirley Ivy at that time that if the victim didn't stop bothering you, you would have to kill her?
MR. RHODES: Objection.
A. No, sir.
THE COURT: Objection's sustained. The jury will disregard

that last statement. It will be stricken. Miss Court Reporter, mark the transcript."

Maurice denied telling Ivy that during the incident Debra's brother and two others came at him with a gun, and that he took the gun away and shot all three men. A defense objection was sustained and the jury was told to disregard the prosecutor's following question: "Did you tell [Shirley] that you were going to try to make some money by pimping when you got [to Detroit]?" Maurice also denied telling Ivy that his previous statements about the incident were a lie. At the conclusion of cross-examination, the following occurred:

"Q. You have never stabbed anybody else, have you?

MR. LEMONS: Objection.

THE COURT: Sustained. Rephrase the question.

Q. Have you ever stabbed anybody before December 3, 1983?

MR. LEMONS: Objection.

THE COURT: Sustained."

Maurice's sister Kathy corroborated her brother's stories involving Debra's attempts to stab Lala and Lenora. Kathy testified that Debra was drinking daily during 1983, and that she carried a gun in her purse. Finally, over defense counsel's objection, Kathy described the incident of May 11, 1983.

The People's first rebuttal witness, Josh Gardner, testified that he saw Coats at the gas station some time after Debra's death, but that Coats did not tell him that he was unaware of what had happened because he was on medication. Josh did not see Connors at the gas station that day.

Coats then testified, apparently in rebuttal to Kathy's testimony and presumably in accordance with the motion *in limine* that on May 11, 1983, Maurice knocked Debra to the floor and said, "Give me the package." When Coats told Debra to comply, she retrieved a gun and gave it to Maurice, who then left. Coats' testimony continued as follows:

"Q. What had happened to Maurice that day?

A. Well, she said something about somebody shot at him, or something. Something like that.

MR. LEMONS: Objection.

THE COURT: Sustained. The jury will disregard it.

* * *

Q. And after the defendant had knocked your daughter down on the ground, did the defendant say anything to you?

A. Well, his sister told us, said, 'Leave her alone.'

MR. RHODES: Objection.

THE COURT: Sustained."

The defendant objected to the admission of Coats' prior consistent statements regarding the events on the morning of the killing; nevertheless, a stipulation was entered into that a court reporter would testify as to the contents of these statements. Coats' statements to the court reporter were later made a part of the record in the trial court.

At the instructions conference, the trial court refused Maurice's tendered jury instructions concerning justified use of force (self-defense), voluntary manslaughter (unreasonable belief and passion), and involuntary manslaughter. Also, the trial court denied defense counsel's motion for a continuance so he could bring in Detective Antonacci to testify that when Ivy called the police in December of 1983, she never mentioned that Maurice had a knife. The trial court also refused to enforce a subpoena issued to Leonard Coleman, ruling that his testimony concerning prior bad acts by Debra were irrelevant, given that self-defense was not an issue.

The defendant made three motions for a mistrial, which were all denied. The defense asserted the following as reasons for a mistrial: (1) Maurice was denied the right to present a defense; (2) improper questions were put to Maurice in respect to his smoking of marijuana and; (3) improper questions were asked of him concerning alleged threats by Maurice to Coats.

During closing argument, the trial court overruled an objection to the prosecutor's comment that, "This is a cut and dried murder case. There is no death penalty hearing, so you shouldn't concern yourselves with any penalty. That's in the Judge's province."

The jury returned with a guilty verdict and the defendant's motion for a new trial was denied. The trial court then sentenced Maurice to 40 years in prison.

OPINION

I

■ The defendant argues that the trial court improperly refused to give instructions regarding the justified use of force, voluntary manslaughter and involuntary manslaughter. Both parties agree that the trial court should have given these instructions if there was even very slight evidence presented which might legitimately lead a jury to the conclusion that Maurice committed voluntary manslaughter, involuntary manslaughter, or acted in self-defense. *People v. Lockett* (1980), 82 Ill. 2d 546, 552, 413 N.E.2d 378; *People v. Simpson* (1978),

74 Ill. 2d 497, 500, 384 N.E.2d 373.

The defense has not met the above requirement. The evidence adduced at trial by the People was totally consistent with a murder charge. Especially noteworthy is the fact that the cut on Debra's neck extended virtually from ear to ear, severing her jugular vein and lacerating her larynx, which is not the type of wound generally inflicted by an individual acting in self-defense. Moreover, the defendant himself testified that the killing was an accident. This court has held that it was proper to refuse self-defense instructions in cases where a gun went off accidentally while the defendant and the deceased struggled for it. *People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448; *People v. Dzambazovic* (1978), 61 Ill. App. 3d 703, 377 N.E.2d 1077.

The only evidence presented at trial which can be considered as tending to show an intent to kill was Maurice's alleged statement to Ivy that he killed Debra in a fight; but this contradicts another statement he made to Ivy in respect to Debra's death, and, as noted, he also testified that Debra died by accident. Maurice's statement to Ivy that he killed Debra in a fight is not by itself enough evidence to warrant a voluntary manslaughter instruction. The case at bar is governed by our supreme court's opinion in *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31, in which the defendant at the time of his arrest stated that he feared that he would be physically harmed, although he testified at trial that he acted solely out of anger. The *Bratcher* court, after mentioning the "very slight evidence" standard for the giving of an instruction alluded to above and advocated here by the defendant, indicated that "the evidence presented in this case is insufficient to meet that minimal level. To hold otherwise would permit a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon *the merest factual reference* or witness's comment." (Emphasis added.) (63 Ill. 2d 534, 540-41; see also *People v. Currie* (1980), 84 Ill. App. 3d 1056, 406 N.E.2d 1142.) Accordingly, absent adequate evidence of the requisite intent to cause serious bodily harm, the trial court's decision not to give a voluntary manslaughter instruction or a self-defense instruction was correct.

The People distinguish adequately the defense's cases on the giving of instructions, in all of which there was some objective evidence pointing to the requisite intent. There is no such evidence in the case at bar. For example, in most of the cases cited by the defendant there were witnesses to the fight. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358; *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 414

N.E.2d 262; *People v. Cruz* (1978), 66 Ill. App. 3d 760, 384 N.E.2d 137; *People v. Dortch* (1974), 20 Ill. App. 3d 911, 314 N.E.2d 324.) In the other two cases relied on by the defendant (*People v. Brooks* (1985), 130 Ill. App. 3d 747, 474 N.E.2d 1287; *People v. Boothe* (1972), 7 Ill. App. 3d 401, 287 N.E.2d 289), the wounds suffered by the deceased were consistent with a theory of self-defense; however, as we have previously pointed out in the case *sub judice* Debra's deep gash to her throat, which severed her jugular vein and lacerated her larynx, is not the type of wound inflicted by an individual who is acting in self-defense. Moreover, our case can be distinguished from *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 505 N.E.2d 1228, wherein this court remanded the cause because the trial court failed to give instructions on voluntary manslaughter and self-defense. Unlike the case at bar, in *Peitryzk* the defendant conceded that he intended to cause injury and that the victim's death was not an accident. Similarly, in the recent case of *People v. Phillips* (1987), 159 Ill. App. 3d 142, this court remanded the cause for a new trial because the circuit court failed to give an instruction on voluntary manslaughter-sudden passion, despite the defendant's testimony that he purposely acted after a disagreement with the deceased. In *Phillips* there was some evidence that the defendant had the intent to cause serious bodily harm; thus, a voluntary manslaughter instruction should have been given. In the instant case, however, there was insufficient evidence before the jury to satisfy the intent element of the crime of voluntary manslaughter; hence, the trial court did not err in refusing to instruct the jury thereon.

■ The defendant also contends that an involuntary manslaughter instruction should have been given. Here again, however, there was inadequate evidence of the requisite intent: recklessness. The defendant can point to no evidence in the record that suggests that he acted in conscious disregard of a risk. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696; *People v. Simpson* (1978), 74 Ill. 2d 497, 504, 384 N.E.2d 373.) On the contrary, according to his testimony he was attempting to eliminate, or at least to mitigate, a risk by getting the knife away from Debra. Therefore, the trial court properly refused to instruct the jury about voluntary manslaughter, involuntary manslaughter, and the justifiable use of force.

## II

■ The People allege that the defendant twice waived the argument that he was entitled to an evidentiary hearing on the issue of whether the prosecution excluded venire persons on the basis of race,

as decided by the United States Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. First, the State cites *People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277, for the proposition that a *Batson* issue is waived if not included in the post-trial motion. However, although *Sanchez* involves an issue as to jury selection, it is not a case in which a party alleges that venire persons were excluded because of their race. The appellate court has already decided that the failure to raise a *Batson* in a post-trial motion does not result in a waiver, deference being given to the plain error rule. (*People v. Brown* (1987), 152 Ill. App. 3d 996, 998-99, 505 N.E.2d 397.) *Brown* obtains here and protects the constitutional rights of the accused.

■ However, as to the second issue relating to jury selection, the People contend that the defendant waived the *Batson* issue by failing to properly preserve a record. Since the record does not indicate the race of the prospective jurors, this court cannot determine whether the People purposefully discriminated against blacks when picking the jury; hence, the issue must be deemed waived. In a case directly on point, this district elaborated upon the matter of preserving the record for a *Batson* determination as follows:

> "[R]eversal is not warranted here as defendant has failed to make a *prima facie* showing of purposeful discrimination against black jurors. In order to do so in the instant case, defendant would have to show that blacks were being excluded from the jury for no apparent reason other than race. Defendant fails to meet his burden because the racial makeup of the prospective jurors excused by use of the peremptory challenges is not established in the record.
>
> \*\*\*
>
> We note that other than counsel's statement, the record indicates neither the race of the prospective jurors excused by peremptory challenge nor does it show the racial identities of the seated jurors. Absent an adequate record, this issue must be considered waived. [Citation.]" *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1084-85, 502 N.E.2d 304.

In the case *sub judice*, as in *Johnson*, the only record of the race of the excluded jurors is the statement of defense counsel. Neither is there any record of the race of the remainder of the venire. Without such information, the defendant has not made a *prima facie* case of purposeful discrimination. (*People v. Brown* (1987), 152 Ill. App. 3d 996, 505 N.E.2d 397.) Consequently, he has waived the *Batson* issue. See *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165.

## III

■ The defendant contends that the prosecutor repeatedly asked questions which he knew were objectionable. The exact subject matter of these questions varied; nevertheless, the inquiries can be divided into two categories. One type of questioning injected Maurice's prior "bad acts." The other line of questioning concerned disagreements between Maurice and Debra. It should be recognized that objections to these questions were sustained, so improper information was not in a technical sense before the jury.

Although this court does not condone the prosecution's practice of asking questions that were clearly inappropriate, we must decide whether the improper questioning was a material factor in the jury's arriving at a verdict. (*People v. Howard* (1984), 121 Ill. App. 3d 938, 951, 460 N.E.2d 432; accord *People v. Flax* (1986), 147 Ill. App. 3d 943, 953, 498 N.E.2d 667.) The evidence of guilt in the case at bar is so overwhelming that any improper questions were at most harmless. Maurice's statement that it would be Debra's last night, the severity of her wound, the jury's apparent acceptance of Ivy's damning testimony, and his flight to Detroit immediately after the commission of the offense, coupled with the absence of any probative evidence from the defense, would doubtless lead any reasonable jury to a guilty verdict. Indeed, the defendant does not argue on appeal that he was not guilty beyond a reasonable doubt.

The Illinois case with a fact pattern most similar to the instant case is *People v. Flax* (1986), 147 Ill. App. 3d 943, 498 N.E.2d 667. In *Flax*, the court held that although there were approximately 10 improper questions, the defendant was not unfairly prejudiced in light of the overwhelming evidence of his guilt, which included numerous eyewitnesses. (147 Ill. App. 3d 943, 952-53, 498 N.E.2d 667.) The case cited by the defendant to support his contention that he was prejudiced by improper questioning is *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924. That case is distinguishable from the instant one, however, because in *Weinger* the improper questioning was more pervasive, given that in that case there were some 35 improper questions. In addition, in *Weinger* there was some doubt as to whether the defendant was the killer of the victim or whether another individual, whose alibi at trial was unconvincing, had murdered the deceased. (101 Ill. App. 3d 857, 866, 428 N.E.2d 924.) Accordingly, we believe that the types of questions asked (*i.e.*, regarding Maurice's prior behavior and prior disagreements between Debra and Maurice) were not of the kind that would have had a significant impact upon the jury's decision.

IV

■ Defense counsel argues that the prosecution did not perfect its impeachment of Maurice in two respects. The first of these concerns a threat that Maurice supposedly made to Coats. Yet, Coats returned to testify that Maurice did threaten to kill him. Therefore, the impeachment was perfected and there was no error.

The second relates to Maurice's alleged use of marijuana laced with PCP on the night of the killing. Admittedly, the prosecution did not perfect impeachment on this subject. However, the error was harmless, especially in light of the fact that evidence was adduced at trial that Maurice had been drinking alcohol heavily during the entire day. Moreover, as we have noted earlier, the evidence of Maurice's guilt was overwhelming. Accordingly, we deem Maurice's alleged use of marijuana laced with PCP to be a collateral matter and we do not see how it could have contributed to the verdict. *People v. Green* (1983), 118 Ill. App. 3d 227, 235, 454 N.E.2d 792.

V

■■ The defendant asserts that he should have been granted a continuance to procure a witness who would testify that Ivy did not mention that Maurice had a knife when she talked with the police. The granting of continuances for the purpose of producing witnesses is a matter within the discretion of the trial court, and a denial thereof will not be reversed absent a showing of an abuse of that discretion. (*People v. Williams* (1982), 92 Ill. 2d 109, 116, 440 N.E.2d 843.) We hold that the trial court's decision in this respect was not an abuse of discretion. It should be noted also that the offered testimony would have been cumulative, since Ivy herself conceded that she might not have mentioned Maurice's possession of a knife when she spoke with the police. Furthermore, the applicable standard for deciding whether Detective Antonacci should have been permitted to testify is whether it was natural or probable for Ivy to mention the knife when she spoke with him. (*People v. Henry* (1970), 47 Ill. 2d 312, 320-21, 265 N.E.2d 876; *People v. Green* (1983), 118 Ill. App. 3d 227, 233, 454 N.E.2d 792.) It was not an abuse of discretion for the trial judge to conclude that it would not have been natural for Ivy to advise the detective that Maurice brandished a knife. Moreover, there is no evidence in the record that the police questioned her during either phone call to elicit information. Accordingly, the trial court did not err.

VI

■ Defendant raises several issues on appeal which were not in-

cluded in his post-trial motion: the introduction of Coats' prior consistent statement; the exclusion of a potential witness' testimony; the prosecutor's statement in closing argument regarding the potential penalty in this case; the trial court's refusal to ask the venire about their membership in certain organizations; the admission of Maurice's hearsay statement through Ivy's testimony; and the sufficiency of the information charging Maurice. We hold these issues to have all been waived because they were not raised in a timely manner. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) Furthermore, we decline to examine these matters under the plain error rule (73 Ill. 2d R. 615(a)), because of the very damaging evidence against Maurice and the relatively insignificant nature of the alleged errors. *People v. Jackson* (1981), 84 Ill. 2d 350, 360, 418 N.E.2d 739.

## VII

■■■ Finally, the defendant objects to the manner in which the State impeached Connors. The People's question to Connors regarding a prior misdemeanor conviction was objected to and the objection was sustained by the trial court. Connors already had admitted to a conviction for armed robbery, and later testified that he was on probation for burglary. Therefore, Connors' credibility had been substantially discredited, and any error was harmless, especially due to the conclusive evidence of Maurice's guilt. Finally, any damage was cured by the trial court's instruction to disregard the question about the misdemeanor. *People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277.

In light of the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

STAMOS and HARTMAN, JJ., concur.