THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY BEARD, Defendant-Appellant.

First District (6th Division)   No. 1—91—0548

Opinion filed May 14, 1993.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Theodore F. Burtzos, Bennett E. Kaplan, and Robin M. Mitchell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Defendant, Anthony Beard, appeals his conviction following a jury trial pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603). Defendant seeks to overturn his criminal conviction for first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) and his sentencing under the Habitual Criminal Act (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1) (the Act).

As defendant raises no issues concerning the underlying facts of his case, the background of this appeal can be briefly summarized. On February 17, 1989, defendant was charged by indictment with three counts of murder, one count of armed robbery and one count of unlawful use of a firearm by a felon in connection with the shooting of Walter Reese. Prior to trial, the one count of armed robbery and the one count of unlawful use of a firearm by a felon were nol-prossed because the statute of limitations had expired.

The trial court began the jury selection procedure by questioning a panel of 14 venirepersons. After these 14 were questioned, all of the parties proceeded to chambers to continue the jury selection process. In chambers, the trial judge indicated that he had marked each of the jury cards with the race of each venireperson: "W" for white, "B" for black, "O" for oriental, and "L" for Latino. These cards, which have been made part of the record on appeal, show that 2 of the 14 veniremembers were black and 12 were white. Because defendant is black and the victim is white, the trial court also indicated that if and when the State challenged a black venireperson, the State would automatically be required to provide a race-neutral reason for the challenge. Thereafter, as to the panel of 14 venirepersons, the State exercised two peremptory challenges. Neither of the two venirepersons challenged by the State was black.

The trial judge then questioned a second panel of 14 venirepersons. Of this second panel of 14, 10 were white, 2 were black, 1 was Latino and 1 person was considered by the trial judge to be either "Latino" or "White." The juror card for this veniremember, Lupe Cahul, was marked by the trial judge "L/W/?". The parties again went to chambers to continue the jury selection process. The trial judge excused three venirepersons for cause. Thereafter, the first four venirepersons on the panel were considered and neither the State nor defendant exercised any peremptory challenges. Thus, the 12 members of the jury had been chosen: eight from the first panel and four from the second panel. Of the 12 jurors chosen, nine were white, three were black.

The remaining seven venirepersons on the second panel were then considered to fill the two alternate juror positions. In choosing the two alternate jurors, the State exercised two peremptory chal-

lenges. One of the two was exercised against a black venireperson, Earlene Blanchard. Pursuant to the trial court's policy that the State automatically provide a race-neutral reason if a black venireperson is challenged, the State indicated that it decided to strike her because her son had been shot and because no charges had ever been filed in that case. Without objection by defendant's counsel, the trial court accepted the State's reason as being sufficiently race-neutral. After trial, the jury found defendant guilty of two of the three murder counts. Defendant subsequently filed motions for a new trial which were denied.

During defendant's sentencing hearing, the State filed a motion requesting that defendant be sentenced to death or, in the alternative, to life imprisonment as a habitual criminal pursuant to the Act. At the sentencing hearing, the trial court found defendant eligible for the death penalty and heard evidence in aggravation and mitigation. Included in the State's evidence were certified copies of conviction which showed defendant had been convicted of rape on March 19, 1976, and of armed robbery on February 4, 1980. Also submitted were documents which had been retained by the Illinois Department of Corrections indicating that defendant's armed robbery conviction had been committed on June 26, 1979. After considering this evidence and the defendant's evidence in mitigation, the trial court sentenced defendant to life imprisonment on the count of intentional murder. A motion for a new sentencing hearing was heard and denied on February 7, 1991, and a notice of appeal was timely filed.

# I

In the past few years there has been an upheaval in the law with regard to the proper use of peremptory strikes during the *voir dire* process. In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Court found that the use of peremptory strikes by the State to purposefully exclude black jurors in the criminal trial of a black defendant violated the equal protection clause of the Federal Constitution. In *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364, the Supreme Court held that in the trial of a white criminal defendant, the State is similarly prohibited from excluding black jurors on the basis of race. In *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077, the court decided that, even in civil cases, private litigants cannot exercise their peremptory strikes in a racially discriminatory manner. Finally, and most recently in *Georgia v. McCollum* (1992), 505 U.S. 42, 120 L. Ed. 2d 33, 112 S. Ct. 2348, the Supreme Court held that the equal protection clause also

prohibits a criminal defendant from engaging in purposeful racial discrimination in the exercise of peremptory challenges.

■ The State first claims that defendant has waived his *Batson* challenge by his failure to raise it either during the *voir dire* proceedings or in his post-trial motion. In Illinois, both an objection during the proceedings and a written post-trial motion raising the issue are generally necessary to preserve the issue for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.) As discussed below, however, the trial court in the present case raised the *Batson* question *sua sponte* with the parties. Defendant is not obligated, therefore, to have raised the issue himself. *People v. Whaley* (1989), 184 Ill. App. 3d 459, 463 ("fact that the trial court is made aware of the claim, not the manner in which the claim is made, is dispositive").

The more troubling problem comes in defendant's failure to raise his *Batson* challenge in his post-trial motion. As an initial attack against a possible waiver argument, defendant raises the plain error rule, which allows the court to consider waived issues when the evidence is closely balanced or where the fundamental fairness of the proceeding was affected. (*People v. Fields* (1990), 135 Ill. 2d 18, 56.) While defendant has made no claim that the evidence in this case is closely balanced, several courts have found that a defendant's failure to raise a *Batson* claim in a post-trial motion does not waive the issue due to the constitutional importance of the rights affected. (*People v. Whaley* (1989), 184 Ill. App. 3d 459; *People v. Mitchell* (1987), 163 Ill. App. 3d 58; *People v. Brown* (1987), 152 Ill. App. 3d 996.) Other courts, however, have reached a different conclusion. (*People v. Harris* (1990), 195 Ill. App. 3d 507; *People v. Phillips* (1989), 186 Ill. App. 3d 668.) In any case, consideration of defendant's *Batson* claim is within the appellate court's discretion, (*People v. Mitchell* (1992), 152 Ill. 2d 274), and, even were it assumed that a proper post-trial motion were filed, defendant's *Batson* challenge is without merit.

■ In *Batson*, the Supreme Court outlined a systematic, three-stage process by which a criminal defendant may challenge a prosecutor's use of peremptory challenges. (*Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24.) First, the defendant must make out a *prima facie* showing that the prosecutor has used his or her peremptory challenge on the basis of race. (*Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24.) This may be done by showing the following factors: (1) defendant belongs to a racial group capable of being singled out for differential treatment; (2) the State removed members of defendant's race from the venire by using peremptory challenges; and (3) any other "relevant circumstances,"

including (a) a pattern of strikes against minority veniremembers, (b) disproportionate use of strikes against such members, (c) whether the excluded veniremembers were a heterogeneous group sharing race as their only common characteristic, (d) the level of representation in the venire as compared to the jury, (e) prosecutorial questions and statements during *voir dire* and while exercising challenges, and (f) the races of defendant and victim or of defendant and witnesses.[1] (*People v. Jackson* (1991), 145 Ill. 2d 43, 99.) Second, if the trial court rules that this showing has been made, the burden shifts to the State to articulate a race-neutral explanation for striking the jurors in question. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Though the State's explanation need not rise to the level justifying exercise of a challenge for cause, the prosecutor may not merely affirm his good faith in making the strike or state that the veniremembers were challenged on an assumption that they would be partial to the defendant on account of their shared race. (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Lastly, once the State has offered a race-neutral reason, the trial court must determine if the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.

In *People v. Jackson* (1991), 145 Ill. 2d 43, our supreme court emphasized the importance of trial courts rigorously following the *Batson* three-step process and condemned procedures of the type employed by the trial court in this case:

> "We have previously cautioned trial courts against collapsing what ought to be a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions. [Citations.] It appears we must now caution trial courts against a procedure whereby the first step in the *Batson* analysis is omitted altogether. We are here concerned with a 'peremptory' challenge, which by definition is '[t]he right to challenge a juror without assigning, or being required to assign, a reason for the challenge.' [Citation.] The procedure which the trial court employed in this case essentially deprives the State of the right to exercise a peremptory challenge against a black venire member." (*Jackson*, 145 Ill. 2d at 98-99.)

By requiring the State to offer a race-neutral reason every time it struck a black juror, the trial court collapsed the *Batson* analysis and

---

[1]Recently, the Supreme Court modified this formulation by holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race." *Powers v. Ohio* (1991), 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366.

has made review of the case unnecessarily difficult. *People v. Valentine* (1991), 221 Ill. App. 3d 1082, 1086-87 ("[t]his practice of 'collapsing' the *Batson* steps, as well as trial courts' failure to make detailed findings of fact to clarify the record when the *Batson* objection is raised, needlessly adds to the number of costly appeals"); *People v. Murff* (1991), 214 Ill. App. 3d 1034, 1040 ("we do not approve of the consolidated *Batson* hearing held below"); *People v. Jones* (1989), 185 Ill. App. 3d 208, 216 (although the consolidated proceeding was not erroneous, "this is not the recommended procedure").

Defendant argues that because the State offered race-neutral explanations for its peremptory challenges and the trial court ruled on the ultimate issue of intentional discrimination, the preliminary issue of whether defendant has made a *prima facie* showing has become moot and should not now be considered. (*Hernandez v. New York* (1991), 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.) The State responds by noting that *Hernandez* has been found to apply only where the State offers a race-neutral explanation *without* prompting from the trial court and that, because the trial court improperly required a race-neutral explanation each time a black veniremember was struck, we must now address the question of whether defendant did, in fact, make out a *prima facie* case. *People v. Campbell* (1992), 240 Ill. App. 3d 179, 181-82; *People v. Coulter* (1992), 230 Ill. App. 3d 209, 223.

The disagreement between the State and the defendant stems from the following language found in the supreme court's decision in *People v. Jackson* in which the court emphasized the word "without":

"The prosecution in this case should not have been required to justify its use of peremptory challenges against blacks.

However, it should be noted that when a prosecutor defends his use of peremptory strikes *without* any prompting from the trial court, the court has no occasion to rule whether the defendant has or has not made a *prima facie* showing of intentional discrimination. 'Once a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a *prima facie* showing becomes moot.' " (Emphasis in original.) (*Jackson*, 145 Ill. 2d at 101, quoting *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.)

Although the *Jackson* decision did not address itself to the question of whether the defendant in that case had made out a *prima facie* case, both the *Campbell* and *Coulter* cases which support the State's position cited *Jackson* before embarking upon such an analysis. *Campbell*, 240 Ill. App. 3d at 182; *Coulter*, 230 Ill. App. 3d at 223.

It is interesting to note that the *Jackson* decision was authored by Justice Cunningham, who also authored the supreme court's more recent decision in *People v. Mitchell* (1992), 152 Ill. 2d 274. As in *Jackson*, the prosecutor in the *Mitchell* case offered his race-neutral reasons for striking black jurors only after prompting from the trial court. (*Mitchell*, 152 Ill. 2d at 287.) Despite this fact, however, the *Mitchell* opinion did not address itself to the question of whether the defendant had made out a *prima facie* case. Instead, the *Mitchell* opinion, as did the *Jackson* opinion before it, merely addressed the question of whether the reasons offered by the State for striking black jurors were sufficiently race-neutral. Indeed, the *Mitchell* decision specifically states:

> "In the instant case, the trial court never determined whether defendant established a *prima facie* case under *Batson*. However, the court did find that the State had neutral or valid reasons for exercising the peremptory challenges. *We thus need only review the trial court's ruling that the State's reasons were valid or neutral, as the question of whether defendant established a prima facie case of racial discrimination became moot when the trial court found that the prosecutor's explanations for the challenges were valid and neutral.*" (Emphasis added.) (*Mitchell*, 152 Ill. 2d at 289, citing *Hernandez*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.)

The *Mitchell* decision appears, therefore, to have undermined the analysis applied by *Campbell* and *Coulter*. We therefore follow the example provided by the supreme court in *Mitchell* and *Jackson* and address ourselves only to the question of whether the race-neutral explanation offered by the State would have been sufficient to rebut a *prima facie* showing.

During the questioning of the second panel of prospective jurors, the trial judge questioned a white woman named Alice Cwik. She was 60 years old, owned her own home, and had never been on a jury before. After giving some other basic information about her background, she stated that she had been a victim of recent crime in that her garage had been burned down and her car had been destroyed. She indicated that no one was apprehended in regard to this incident. When the trial judge asked if this incident would affect her impartiality in the case, she responded "no."

The trial judge later questioned Earlene Blanchard. Ms. Blanchard was an African-American, was 61 years old, also owned her own home and had never been on a jury before. Ms. Blanchard stated that her son was on disability because he had been shot, and that a long time ago, her husband's car was stolen and he had been robbed.

Ms. Blanchard told the trial judge that the incidents involving her husband would not affect her impartiality "because we didn't even— that was no jury either on that. There was no court, you know, nothing about that." When asked to defend his decision to strike Ms. Blanchard from the jury, the prosecutor stated:

> "Judge, she talked about her son being shot, and that they did not press charges, and did not go to court on that case, and she was in agreement with that decision apparently, with the family."

Although the prosecutor appeared to have misunderstood Ms. Blanchard's testimony (it appears that Ms. Blanchard's comments were directed to her husband's experience in having his car stolen, not her son's experience in being shot), defense counsel did not object to the reason given by the State. However, defendant now claims that because both women indicated that they had been the victims of violent crime in which no one was prosecuted, the only genuine difference between Earlene Blanchard and Alice Cwik is their differing races. Defendant claims, therefore, that the State's race-neutral reason for striking Ms. Blanchard was pretextual.

■ The prosecution's reasons for excluding a juror following a *Batson* challenge must be " 'clear and reasonably specific,' contain 'legitimate reasons for exercising the challenges,' and be 'related to the particular case to be tried.' " (*People v. Mitchell*, 152 Ill. 2d at 291, quoting *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88 & n.20, 106 S. Ct. at 1724 & n.20.) A neutral explanation "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the *facial* validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (Emphasis added.) *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

This is not to say, of course, that similarities between those persons the State chooses to strike and those it leaves on the jury are irrelevant to the inquiry. They are relevant both to a trial court's initial consideration and our consideration of such questions on appeal. However, the trial court's decision as to whether a *prima facie* case is rebutted is ultimately a factual question based on the credibility of the prosecutor; the court's decision must not be reversed unless it is against the manifest weight of the evidence. *People v. Harris* (1989), 129 Ill. 2d 123, 175; see also *People v. Hope* (1992), 147 Ill. 2d 315.

■ While we agree that similarities between Ms. Cwik and Ms. Blanchard give some support to defendant's claim of discrimination, we do not believe they rise to a level sufficient to overcome his

burden. In this case the prosecutor offered a specific and facially race-neutral explanation for excluding Ms. Blanchard. Because we believe the trial court was within its discretion in accepting this explanation, we uphold the trial court's decision.

## II

■ Defendant next argues that he was incorrectly found to be, and was sentenced as, a habitual criminal pursuant to the Habitual Criminal Act (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1) (the Act). The Act provides that every person who is three times convicted of a Class X felony or murder within a 20-year period is to be sentenced to life imprisonment. By its own terms, however, the Act does not apply unless each of the following conditions is met:

"(1) the third offense was committed after the effective date of the Act [February 1, 1978];

(2) the third offense was committed within 20 years of the date that judgment was entered on the first conviction, provided, however, that time spent in custody shall not be counted;

(3) the third offense was committed after conviction on the second offense;

(4) the second offense was committed after conviction on the first offense." (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1(d).)

While there has been some disagreement as to the question of the State's burden of proof under the Act, this court has previously concluded that "the better view is that the State must prove the material allegations of its petition beyond a reasonable doubt." (*People v. Davis* (1990), 205 Ill. App. 3d 865, 872; see also *People v. Walker* (1992), 228 Ill. App. 3d 76; *People v. Mays* (1988), 176 Ill. App. 3d 1027; *People v. Gill* (1988), 169 Ill. App. 3d 516; *People v. Mason* (1983), 119 Ill. App. 3d 510.) We therefore apply this standard.

While defendant concedes that the State has sufficiently proved the dates of *conviction* for the two previous Class X felonies, a criterion required by the Act, he argues that the State did not sufficiently prove the date of *commission* of the second offense, as required by section 33B—1(d)(4). The certified statements of conviction indicate that defendant was convicted of his first offense on March 19, 1976, and of his second offense on February 4, 1980.

■ A review of the record indicates, however, that the trial court was presented with sufficient evidence to conclude that defendant's second offense was committed after his first conviction. As noted, the State presented the trial court, without objection, a certified statement of conviction indicating that information 79—I—4498 was filed July 17, 1979, against Anthony Beard for armed robbery. This document also indicates that Anthony Beard pled guilty to this

offense on February 4, 1980, that judgment was entered on this conviction that same day and that Anthony Beard was sentenced to eight years in the Illinois State Penitentiary.

Defendant points out that this document fails to indicate *when* he committed this crime. As additional evidence, however, the State introduced a memorandum prepared by Assistant State's Attorney Melanie Vogl which had been retained by the Illinois Department of Corrections. It is dated March 17, 1980, nearly 13 years ago. This document indicates that information No. 79—I—4498 was brought against Anthony Beard based on an armed robbery which occurred June 26, 1979. The memorandum also indicates that Anthony Beard pointed a gun at a victim, forced him to lie on the floor, and took $120 from a cash register. Defense made no objection to the introduction of this document.

To corroborate the memorandum, the State also introduced a corrected mittimus dated February 4, 1980. This document was also retained by the Illinois Department of Corrections and was received in evidence without objection. It indicates that Anthony Beard had been adjudged guilty of armed robbery pursuant to information No. 79—I—4498 and that he had been sentenced to eight years' imprisonment. A sheriff's stamp on the back of the mittimus reflects that Anthony Beard was admitted to custody on June 29, 1979, for the offenses charged in information No. 79—I—4498.

Because we find these documents to constitute sufficient evidence to prove beyond a reasonable doubt that defendant's second Class X felony was committed *after* his conviction for his first Class X felony on March 19, 1976, the State has met its burden under the Act and defendant was properly sentenced to life imprisonment as a habitual criminal.

For the foregoing reasons, defendant's conviction for first degree murder and his sentencing under the terms of the Act are affirmed.

Affirmed.

McNAMARA, P.J., and EGAN, J., concur.