THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARNEST JOHNSON, Defendant-Appellant.

Fifth District   No. 5—83—0721

Opinion filed December 10, 1985.

Randy E. Blue and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Mark Howard Clarke, State's Attorney, of Cairo (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, and Joseph J. Ciaccio, Sr., of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Earnest Johnson, was found guilty of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)) and armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2) by a jury in the circuit court of Alexander County. He was sentenced to a term of natural life imprisonment for murder (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(b)) and to a concurrent extended term of imprisonment of 50 years for armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)(2)).

Defendant has perfected the instant appeal, contending that he was denied a fair trial because: (1) an inadmissible hearsay confession

allegedly attributable to him was admitted into evidence under the guise of impeachment; and (2) the admission into evidence of the autopsy photograph served no useful purpose other than to inflame the passions of the jury.

The following evidence was adduced at trial. At approximately 2:30 p.m. on July 4, 1983, a young man went to the Gloria Thomas residence in Cairo and asked Ms. Thomas if he could use her telephone to call an ambulance for a man who had been hurt. After telephoning for an ambulance, the young man left the Thomas residence briefly, then came back and said that the ambulance had not come and that a man around the corner from the Thomas residence was bleeding. Ms. Thomas then left her house and followed the young man around the corner to 1811 Commercial Avenue, where she found a man lying in the doorway with a gash in his head. Ms. Thomas immediately returned to her home and telephoned for the police and an ambulance.

Cairo police officer Scott Watson was dispatched to the scene at 2:47 p.m. Upon arrival, Watson saw 69-year-old John Busby, an acquaintance who operated a garage at 1811 Commercial, lying on the floor with a badly bleeding head wound and facial bruises. Watson observed that Busby was not wearing his artificial leg and that a large metal wrench was on the floor to the right of the doorway. There was blood on both sides of one end of the wrench. Although Busby was conscious, he could not account for the source of his injuries. Busby died later of brain damage caused by two skull fractures.

After loading Busby into the ambulance, Watson told everyone to leave so he could secure the crime scene. Fifteen-year-old James O'Del Johnson, who was on the scene when Watson arrived, came back to the scene approximately five minutes later carrying a wallet. This wallet contained the decedent's driver's license and social security card but no money.

Cairo police detective James McKenna arrived on the scene at approximately 3 p.m. McKenna took photographs of the scene and secured, for laboratory processing, the wrench which was on the floor by the doorway. A subsequent laboratory analysis of the wrench revealed no fingerprints. After leaving the scene, McKenna went to the hospital and took two photographs of the decedent. On July 5, 1983, McKenna took an autopsy photograph. This photograph depicted a measuring device beside a wound in the decedent's exposed skull. Some of the decedent's internal organs are also visible in this photograph. All three photographs were admitted into evidence over defendant's objection.

On July 7, 1983, defendant was arrested and charged with the murder and armed robbery of John Busby. After waiving his *Miranda*

rights, the defendant was interrogated by J. Greg Geittman, an investigator with the Department of Criminal Investigation, and Edward Tolbert, an investigator employed by the Alexander County State's Attorney. Geittman testified that the defendant gave the following account of his activities on July 4: At approximately 10:30 a.m. the defendant and his girlfriend went to Ottis Buffington's residence in Cairo. After approximately one hour the defendant left the Buffington residence and went to the Pyramid Courts area, where he met with Roy Simelton, Larry Simelton (also known as Larry Martin), and an individual the defendant knew as "Elbow." The defendant went down to the river with these individuals shortly after 12 noon. After leaving the company of these three men, the defendant met Phillip Justice at the corner of 18th and Washington Streets at approximately 2:30 p.m. When asked what he was wearing, the defendant stated that he wore a dark blue tank top shirt and a pair of red trousers throughout the entire day. He also denied ever going into the decedent's garage.

The above statement conflicted with the testimony of several witnesses. Ottis Buffington testified that although he did not leave his residence on July 4, he did not see the defendant that day until approximately 4:30 p.m. Larry Martin (also known as Larry Simelton) testified that although he did not see the defendant on July 4, he and his brother, Roy Simelton, walked to the river with the defendant on July 5. Phillip Justice testified that when he saw the defendant at approximately 11:30 a.m., the defendant was wearing blue jeans. Justice stated that he was out of town on July 5.

Michael Busby, the decedent's son, last saw decedent alive at approximately 2 p.m. At this time, the decedent had $70 and a "V" nickel in his wallet. Busby stated that he had seen the defendant in his father's garage on a previous occasion.

Walter Smith, the operator of a local dice game, saw the defendant shooting dice at approximately 4:30 p.m. The defendant had approximately $20 in his possession when Smith observed him. The defendant's grandmother later testified that she had given the defendant $30 earlier that morning.

Walter Williams, the owner of a second-hand store, testified that the defendant came by his house during the afternoon and showed Williams an old nickel. The defendant asked Williams what he thought the nickel was worth.

James O'Del Johnson testified that at approximately 2:30 p.m. he was standing at a basketball court approximately half a block away from the decedent's garage when he saw defendant enter the garage. During the two to five minutes the defendant was inside, Johnson

heard a metal clang. When the defendant emerged from the garage, he looked both ways and walked "downtown." Johnson then went to the garage and saw the decedent bleeding on the floor. He immediately left the garage and went to a nearby residence to phone an ambulance. Shortly thereafter, Johnson walked "downtown" four or five blocks and found a wallet. He brought this wallet back to a police officer at the garage.

On cross-examination Johnson admitted that he told the police officer who first arrived on the scene that he neither saw nor knew anything concerning the incident. Johnson also admitted that he did not connect defendant with this incident until after defendant's name was suggested by police officers during questioning. Although Johnson at first denied seeing the defendant on July 4 after the incident, he admitted that he saw and spoke with the defendant later that afternoon. Johnson could not recall what defendant was wearing on July 4.

Lazurus Jones testified that when he saw defendant at approximately 12:30 p.m., defendant was wearing a red shirt and dark slacks. Shirley Leonard testified that when she saw defendant at approximately 6 p.m., he was wearing a black vest and black slacks.

The first issue raised by defendant on appeal involves an alleged confession which the State elicited through corrections inmate Dewayne Davis and State's Attorney's investigator Edward Tolbert near the end of the first day of trial. Davis testified substantially as follows:

"Q. Were you and Earnest Johnson both in custody in the Alexander county jail on July the 16th?

A. Yes.

Q. And did you have an occasion to talk with Earnest Johnson?

A. Sometimes.

Q. Did he ever talk to you about the matter that he was charged with?

A. No.

Q. Did he ever tell you that he had struck Mr. Busby?

A. No.

Q. In talking with him Dewayne, do you recall having a conversation with Mr. Earnest Johnson during the supper hours on July the 16th?

A. No.

Q. And did Mr. Johnson tell you that he took all of the belongings off of the old man?

A. No.

Q. Did he ever tell you that he took the belongings off the

old man?

A. No.

Q. Did he ever tell you that he knocked the man out?

A. No.

Q. Mr. Davis, have you ever told Mr. Edward Tolbert of my office on July the 19th, something different than what you've testified to here today?

A. No. .

Q. This is a true—in other words, you've told everything truthfylly [*sic*] today?

A. Right."

After Davis testified, the State called Investigator Tolbert as a witness and elicited the following relevant testimony:

"Q. Did you talk with Mr. Davis?

A. Yes sir, I did.

Q. And when and where did you talk with him?

A. It was on July the 19th, of this year, and it was in my office here in the court house.

\* \* \*

A. Other than myself and Mr. Davis, his attorney James Flummer was present.

Q. And do you recall the sum and substance of what Dewayne Davis had to say to you?

A. Yes sir.

Q. And would relate that to the court?

A. Yes sir.

MR. HUNTER [defense counsel]: I object, that this is hearsay. He had the witness on the stand just previously.

MR. O'SHEA [State's Attorney]: Your Honor, I'm trying to impeach the testimony of the former witness by prior inconsistent statements. He has denied he made such a statement.

THE COURT: Is this not proper impeachment? The objection is overruled. Proceed counsel.

Q. Mr. Tolbert, will you relate if you can the sum and substance of the statement given to you by Dewayne Davis, the person that proceeded you in that chair.

A. Yes sir. Mr. Davis advised me that he was locked up in the same cell area as Earnest Johnson and that on July the 14th, in the evening hours around supper time, that he had a conversation with Earnest Johnson concerning the charges that Mr. Johnson was being held for. Mr. Davis advised me that Earnest Johnson told him that he did in fact or was, he was in fact

at Mr. Busby's business and that he told Mr. Busby to take everything out of his pockets and Mr. Busby refused to do this. At this time he struck Mr. Busby in the head and struck him a second time which knocked him out."

Before trial resumed the following day, the trial judge told the State's Attorney not to make any reference to the above testimony in closing argument. The trial judge also informed the jury that Tolbert's testimony was admitted solely for the purpose of impeaching Mr. Davis' testimony and not for any other purpose. Pursuant to the court's instructions, the State's Attorney did not refer to the testimony of Davis and Tolbert in closing argument. Furthermore, the jury was instructed at the close of the trial that it could not consider impeachment evidence as substantive proof of the defendant's guilt.

The impeachment of witnesses was addressed by our supreme court in *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255. There the court stated that "[a] court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." 92 Ill. 2d 545, 563-64, 442 N. E.2d 255, 262-63.

Dewayne Davis testified that he never heard the defendant discuss the offenses with which he was charged. Although Davis' testimony did not support the State's case, it certainly did not contradict or damage the State's case. Nevertheless, the State, ostensibly for the purpose of impeaching Davis, had Investigator Tolbert testify to a confession which the defendant allegedly had made to Davis while the two were incarcerated together. Consistent with our supreme court's pronouncement in *Weaver,* we perceive no possible purpose for impeaching Davis except to attempt to bring inadmissible hearsay to the attention of the jury. We therefore conclude that Tolbert's testimony was not admissible for any purpose and that its admission in the instant case was impermissible.

The State maintains that even if the admission of Tolbert's testimony was erroneous, the error is harmless because the evidence of defendant's guilt was substantial. We do not agree. Where the evidence is closely balanced or the error is of great magnitude, a reviewing court will grant relief so long as the jury's verdict may have re-

sulted from the error. (*People v. Ishmael* (1984), 126 Ill. App. 3d 320, 331, 466 N.E.2d 1334, 1341-42.) The error in the instant case was the admission of a confession the defendant allegedly made to his cellmate. Since confessions are almost always potent evidence of guilt, we find that the error was not harmless. Since we also find that the evidence in the instant case was closely balanced, we cannot rule out the possibility that this error affected the jury's verdict. We therefore reverse the defendant's convictions and remand the cause for a new trial.

Since we are remanding this cause for a new trial on the first issue, we need not address the issue of what impact the autopsy photograph may have had on the jury in this cause. However, we note that the photograph in question, which shows the decedent's exposed skull and internal organs, is in fact gruesome and should not be admitted on retrial unless it is highly probative.

For the foregoing reasons, the judgment of the circuit court of Alexander County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

JONES, P.J., and HARRISON, J., concur.