THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSE R. VILLEGAS, Defendant-Appellant.

First District (1st Division)   No. 1—89—1964

Opinion filed November 25, 1991.

Jerome Rotenberg, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Gael O'Brien, Special Assistant State's Attorney, and Renee Goldfarb and Andy LeFevour, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Jose Villegas was convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2) and received concurrent terms of 50 and 30 years, respectively. Defendant alleges the following reversible errors on appeal: (1) the court improperly excluded numerous hearsay statements of defendant's brother, Gonzolo Villegas, which profess that he, not defendant, murdered the victim; (2) the court erred when it allowed the State to introduce the prior inconsistent statement of defendant's wife, Carmen Villegas; (3) defendant was denied a fair trial when the State confronted defendant with a prejudicial, prior inconsistent statement and then failed to prove it up in rebuttal; (4) the court erred in refusing to instruct the jury on second-degree murder based on sudden and intense passion; and (5) defendant's conviction and sentence for armed violence should be vacated where they are based on the same physical act as defendant's murder conviction.

On January 1, 1988, Jacob Bulthius received multiple stab wounds which caused his death. Defendant was charged with his murder and tried before a jury; the record reflects the following evidence.

Timothy Anderson testified that on January 1, 1988, at approximately 8:30 to 9:30 p.m., he and his friend David Jambrosek went to John and Mary's Tap located in Cicero, Illinois. They were later joined by their friends David Wisnieski and John Beja.

Anderson testified that he played and lost a couple games of pool with two of the Villegas brothers. An argument ensued after Anderson refused to play for money. Defendant then challenged Anderson to a fight, and the two went outside and wrestled alone for 15 to 20 minutes. Anderson testified that defendant was wearing a white sweater with a red "V" in the center.

While defendant and Anderson wrestled, a car containing Jacob Bulthius, his brother Michael and their father, William, pulled up and parked. As the three Bulthius men walked toward the fight, defendant and Anderson stopped fighting. Anderson entered the bar again and soon learned that another fight had begun in the parking lot. Anderson later looked out the bar's window and saw two of the Bulthius men lying on the ground. Anderson saw defendant get into the Bulthiuses' car and drive it away. Anderson stated that defendant, at this time, had what looked like a bloody knife in his hand.

On cross-examination, Anderson admitted that he initially identified Pedro Villegas as the person with whom he was fighting. Two hours later, after being allowed to think about the identification, Anderson selected defendant. Officer DeFalco would later testify that it was Francisco Villegas, not Pedro, that Anderson initially identified. DeFalco also stated that Anderson never told him that he (Anderson) saw defendant with bloody hands and that Anderson told him that defendant never drove away in the Bulthiuses' car.

Michael Bulthius testified that he, his brother and father were driving by the bar when they saw Anderson and defendant fighting. They yelled at them to stop fighting, exited their car and walked towards them. A group of "Mexicans" were standing at the entrance door and asked if they were the police. They responded no and began walking back to the car. As they were walking, they were attacked from behind. Efren Villegas, defendant's brother, struck Michael Bulthius with a pool cue as Michael was being held by two of the Mexicans. Efren tried to stab Michael with the now broken pool cue, but Michael broke free and ran away. Michael was

chased by two Mexicans down an alley and got away. When he returned, his brother Jacob was dead and his father was bleeding from his stomach. The police had arrived and were all over the scene. William Bulthius later died of stab wounds. Michael testified that defendant was wearing a white sweater with a red collar or something red underneath.

John Beja testified that Anderson was fighting with the guy wearing a white V-neck sweater which had red on it. After Anderson came back in the tavern, the six Villegas brothers went outside. One of the brothers came back in the bar and said, "Give me my jacket, I have a gun, I'll shoot them all."

Dave Wisnieski testified that Efren Villegas stabbed William Bulthius three times in the belly. However, at the lineup, Wisnieski identified defendant as the one who stabbed William Bulthius.

Dave Jambrosek testified that defendant and Anderson went outside to fight. Defendant was wearing a white V-neck sweater with a red shirt underneath. After Anderson returned to the bar, he saw defendant arguing with the three Bulthius men. The other Villegases went outside and three of them had pool sticks. Jambrosek saw defendant stab Jacob Bulthius.

Shortly after the Cicero police arrived, a witness informed them that the group of Mexicans fled down the street into a house. The officers proceeded to the house and spoke with a female on the first floor. The officers then went to the attic apartment and knocked on the door. The officers discovered blood on the stair railing and saw movement inside the apartment. The officers kicked the door down and found five male Hispanics hiding in the apartment. Defendant was found hiding without a shirt under a bedroom mattress and placed under arrest.

The parties stipulated that the blood on defendant's pants and stair railing could have come from Jacob Bulthius, Efren Villegas or defendant but not from William Bulthius.

The following witnesses testified for the defense. Carmen Villegas, defendant's wife, testified that during the early morning hours of January 2, 1988, Gonzolo Villegas came to the apartment, went into the kitchen and left a few minutes later. When he returned, he had a knife in his hand with blood on it.

Francisco Villegas testified that he saw one of the Bulthiuses hitting the defendant in an effort to help Anderson. Michael Bulthius said, "Stop the fight. We are police." When Francisco went outside, Michael showed him a police star and told him he was a policeman. Michael then hit Francisco in the face, causing him to

bleed. Francisco saw Gonzolo Villegas stab William and Jacob Bulthius.

Jose Villegas (not the defendant) testified that one of the Bulthius men grabbed defendant and also hit Francisco in the face. The older Bulthius man called him a "wetback" and hit him. He defended himself and saw Gonzolo fighting with the younger Bulthius man. He saw something in Gonzolo's hand which could have been a knife; he also saw blood.

Pedro Villegas testified that he saw Michael Bulthius hit Francisco. He saw Gonzolo stab William Bulthius while he (Pedro) was fighting with him.

Defendant testified that he did not have a knife and did not stab Jacob Bulthius. He also stated that he was wearing a white sweater with a blue jacket and was not wearing anything red.

In rebuttal, the State called Carmen Villegas. She testified that she did not remember telling Detective Wolff that her husband was wearing a white sweater with some type of red shirt underneath it on the night of the murder. The State did not ask her directly what her husband was wearing the night of the murder.

Detective Wolff of the Cicero police testified that on January 2, 1988, at 4:45 a.m., Carmen Villegas told him that her husband was wearing a white sweater with a red shirt underneath the sweater.

Defendant first contends that the court erred when it granted the State's motion *in limine* to preclude any defense witness from repeating the extrajudicial statements of Gonzolo Villegas that he, not defendant, stabbed Jacob Bulthius. Defendant's offer of proof on this matter showed that: (1) shortly after the incident and while in the Cicero police lock-up, Gonzolo told Efren and Jose Villegas that he stabbed Jacob Bulthius; and (2) after being released from custody and in the presence of Carmen Villegas and other family members, Gonzolo stated that he did the stabbing and was fleeing to Mexico because he was scared. The record shows that Gonzolo has fled to Mexico and not returned.

In *People v. Lettrich* (1952), 413 Ill. 172, 108 N.E.2d 488, our supreme court recognized the general rule that "extrajudicial [statements] of a third party, not made under oath, that he committed the crime, are purely hearsay, and even though they are declarations against interest, are inadmissible." (*Lettrich*, 413 Ill. at 178, 108 N.E.2d at 491.) *Lettrich*, however, held that "where it is obvious that justice demands a departure," an exception to the general rule may prevail. *Lettrich*, 413 Ill. at 178-79, 108 N.E.2d at 492.

■ Cases subsequent to *Lettrich* no longer employ the "if justice so requires" language when discussing this hearsay exception. Rather, in light of *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, the exception is now generally termed the "statement-against-penal-interest exception to the hearsay rule." *(People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995, 999; see also *People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470; *People v. Craven* (1973), 54 Ill. 2d 419, 299 N.E.2d 1.) Under this exception, the admission of the hearsay statement turns on whether the statement is supported by sufficient indicia of trustworthiness. In *Chambers*, as recognized in *Bowel*, the Supreme Court expressed that the following four indicia should be considered in determining the existence of the exception: (1) whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the statement is corroborated by other evidence; (3) whether the statement is self-incriminating and against the declarant's penal interest; and (4) whether there is adequate opportunity for cross-examination. *(Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49; *Bowel*, 111 Ill. 2d at 66, 488 N.E.2d at 999.) No one factor is a prerequisite to admissibility *(Bowel*, 111 Ill. 2d at 68, 488 N.E.2d at 999-1000; *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1018, 501 N.E.2d 207, 219), other indicia of trustworthiness may be considered *(Kokoraleis*, 149 Ill. App. 3d at 1024-25, 501 N.E.2d at 223-24; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §804.7 (5th ed. 1990) (hereinafter Handbook)), and the court's determination on the issue of admissibility will be affirmed absent a clear abuse of discretion. *Bowel*, 111 Ill. 2d at 68, 488 N.E.2d at 1000.

■ In this case, we believe the court properly excluded the proffered testimony. Initially, we note that the State does not dispute the existence of the first and third *Chambers* factors. The State recognizes that Gonzolo's statements were made to family members shortly after the incident and are against Gonzolo's penal interest. We also note that defendant does not contest Gonzolo's unavailability for cross-examination. Accordingly, the issue before the court is whether, under the second *Chambers* factor, Gonzolo's statements are sufficiently corroborated by other, independent evidence. As to this factor, *Chambers* illustrated the type of corroboration required:

> "[E]ach [declaration] was corroborated by some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that

McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each." *Chambers*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048.

Here, we cannot help but note that all the witnesses who would testify regarding Gonzolo's extrajudicial statements are related to defendant and, therefore, have a defense bias. Second, no physical evidence was introduced at trial to tie Gonzolo to the crime: no blood was found on Gonzolo's person or clothing, no knife was ever found and no fingerprints exist. Third, no independent witness, such as an eyewitness or police officer, testified to corroborate Gonzolo's claim that he committed the stabbing. In this regard, an independent witness, Dave Jambrosek, identified defendant as wielding the knife which stabbed Jacob Bulthius. Finally, Gonzolo's alleged statements could be characterized as cumulative of defendant's other witnesses. These witnesses offered testimony to support the conclusion that Gonzolo, not defendant, stabbed Jacob Bulthius. Accordingly, the proffered statements would have added nothing more to the testimony which the jury ultimately rejected. For these reasons, we find the trial court did not abuse its discretion in excluding Gonzolo's extrajudicial statements.

Defendant's second contention is that the court erred in admitting, as impeachment evidence, Carmen Villegas' out-of-court statement to the police regarding what color shirt defendant was wearing on the night of the murder. Defendant further notes this error was aggravated when the State, during closing argument, used Carmen's statement as substantive evidence of defendant's shirt color on the night of the murder.

■ The record with respect to this issue reflects that the State called Carmen Villegas in rebuttal to contradict defendant's testimony that he wore nothing red on the night of the murder. She testified as follows:

"Q. [Assistant State's Attorney]: And ma'am, I am going to ask you if you recall talking with Cicero police officers on January 2, 1988 at approximately 4:45 in the morning?

A. No, I don't.

Well, I remember talking to them and everything, but I don't remember the time exactly.

Q. Okay, Was it sometime in the early morning hours?

A. Yes.

Q. And was it at the Cicero Police Department?

A. Yes.

Q. Do you recall talking with a Sergeant Wolff?

A. Yes.

Q. And do your recall telling him that when your husband left home earlier on the evening of January 1, 1988—

MR. LUCENTI [Defense attorney]: Judge, I will object. This is improper rebuttal.

THE COURT: Overruled.

Q. Do you recall telling Detective Wolff or Sergeant Wolff that when your husband left your home earlier on the evening of January 1, 1988, he was wearing a white sweater and some type of red shirt underneath his sweater?

A. I don't remember exactly what I said to him."

The State then called Officer Wolff. Over objection, Wolff testified that he interviewed Carmen Villegas on January 2, 1988, and she told him that her husband was wearing a white sweater with a red shirt underneath the sweater on the night of the murder. During closing argument, the State referred to Carmen's testimony as follows:

"The defendant tells you or wants you to believe that he wasn't wearing anything red under his V-neck sweater, yet even his wife told the police at the time of his arrest that earlier in the evening he had been wearing a white V-neck sweater with red underneath the 'V.' Now, of course, Carmen doesn't remember that fact, but she did tell that to the police shortly after the incident."

The impeachment of witnesses is governed by Supreme Court Rule 238(a); this rule provides: "The credibility of a witness may be attacked by any party, including the party calling him." (134 Ill. 2d R. 238(a).) Cases interpreting this rule have held that a party impeaching its own witness with a prior inconsistent statement must first show that the witness' testimony has damaged its position. (*People v. Johnson* (1985), 138 Ill. App. 3d 980, 486 N.E.2d 433; *People v. Amato* (1984), 128 Ill. App. 3d 985, 471 N.E.2d 928; *People v. Bolden* (1987), 152 Ill. App. 3d 631, 504 N.E.2d 835.) The rationale for this showing was stated by our supreme court in *People v. Weaver* (1982), 92 Ill. 2d 545, 563-64, 442 N.E.2d 255, 262-63:

"A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple:

No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful."

In this case, Carmen Villegas' testimony clearly failed to damage the State's position. The short of the matter is that she was never asked directly what her husband was wearing on the night of the murder. What the State did in this case was jump directly into her extrajudicial statement without first asking this direct question. Prior to this jump, Carmen's testimony had not hurt the State's case. To attempt an impeachment of Carmen was therefore erroneous because there was simply *no* in-court testimony to impeach. Accordingly, the court erred in allowing Carmen's extrajudicial statement into evidence under the guise of impeachment testimony. Compare *People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341; *Weaver*, 92 Ill. 2d 545, 442 N.E.2d 255; *Bolden*, 152 Ill. App. 3d 631, 504 N.E.2d 835; *Johnson*, 138 Ill. App. 3d 980, 486 N.E.2d 433 (no damage shown), with *People v. Chevalier* (1987), 159 Ill. App. 3d 341, 512 N.E.2d 1001; *Amato*, 128 Ill. App. 3d 985, 471 N.E.2d 928 (damage shown).

Having determined that error occurred, we must examine whether reversal is required. Where there is sufficient competent evidence establishing a defendant's guilt beyond a reasonable doubt, and defendant cannot show that the error was the basis of the jury's verdict, the error is harmless, and reversal is not required. (*People v. Spence* (1989), 188 Ill. App. 3d 761, 766, 544 N.E.2d 831, 835.) It is the defendant's burden to demonstrate prejudice and to establish that there was a reasonable possibility that the error, in light of all the evidence, was a material factor in his conviction. *Spence*, 188 Ill. App. 3d at 766, 544 N.E.2d at 835.

In this case, we agree with defendant that the color of his shirt was a crucial fact for it served as the basis of his identification. We also agree that the State aggravated the error when it improperly imparted substantive value to Carmen's testimony during closing argument. Nevertheless, we believe that sufficient, independent evidence exists aside from Carmen's testimony to establish the color of defendant's shirt that evening.

John Beja and Dave Jambrosek described defendant as wearing a white V-neck sweater with a red shirt underneath. Tim Anderson

described defendant as having a white V-neck sweater with a red "V" in the center. Michael Bulthius testified that defendant was wearing a white sweater with a red collar or something red underneath. Significantly, all these witnesses had ample opportunity to view defendant and isolate him in their minds from the rest of the Villegas brothers. We believe this evidence, taken wholly apart from Carmen's testimony, sufficiently established the color of defendant's shirt on the night of the murder. Accordingly, Carmen's testimony on this matter was cumulative and, therefore, harmless.

■ Defendant next contends that the State erred when it failed to perfect defendant's impeachment regarding a conversation defendant allegedly had with the police following his arrest. During defendant's cross-examination, the following colloquy took place:

> "Q. [Assistant State's Attorney]: Okay. During the conversation with [the police officer], do you recall telling him that when you ran to your house to the attic apartment, you took off your red sweater, your shoes, and a blue plaid jacket and laid in bed to go to sleep?
>
> A. I don't remember me telling him that."

The State admits that it failed to perfect the attempted impeachment but contends that any error was harmless. We agree.

A good-faith basis of inquiry regarding a prior inconsistent statement is required; innuendos or insinuations of a nonexistent statement are improper. (Handbook, §613.3, at 466.) If the witness denies making the statement, states that he cannot remember making it, or otherwise equivocates, the prior statement, if noncollateral, must be proved. (*People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 896, 420 N.E.2d 461, 469, *cert. denied* (1982), 455 U.S. 948, 71 L. Ed. 2d 661, 102 S. Ct. 1448; Handbook, §613.3, at 467.) However, a failure to follow through with proof of a prior inconsistent statement will not require reversal where there is positive evidence of guilt, the comment was not a material factor in the conviction, or the verdict would not have been different had the error not been made. *Purrazzo*, 95 Ill. App. 3d at 897, 420 N.E.2d at 469-70; see also *People v. Allen* (1959), 17 Ill. 2d 55, 160 N.E.2d 818; *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272; *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792; *People v. Cain* (1979), 70 Ill. App. 3d 1, 388 N.E.2d 54.

In this case, we believe the jury's verdict would have been the same had the attempted impeachment not been made. First, the question was isolated and not referred to again during the course of trial. Second, the question referred to defendant as wearing a red

sweater. All the State's witnesses testified that defendant was wearing a white sweater. Defendant himself testified to this effect. Finally, defendant was not wearing any shirt when he was arrested and, thus, there is some partial truth to the State's question. For these reasons, we believe the State's attempted impeachment does not require reversal as defendant would have been convicted anyway had the error not occurred.

■ Defendant next contends that the court erred when it failed to instruct the jury on second-degree murder. During the instruction phase of this case, defendant tendered pattern jury instructions pertaining to second-degree murder. The court refused to give these instructions. Defendant contends this refusal was error because evidence exists to show that mutual combat occurred between the Villegas brothers and the Bulthius family. Defendant cites in particular the defense testimony that Michael Bulthius started the fight by punching Francisco Villegas in the face which caused him to bleed. Thereafter, fighting erupted between the two families.

The second-degree murder statute relevant to this issue provides in part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; ***

* * *

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

Whether to tender a jury instruction on voluntary manslaughter is within the discretion of the trial court; however, this discretion is controlled by clear guidelines established by our supreme court. (*People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331, 333-34.) Defendant has the burden of proving there is at least "some evidence" of serious provocation or the trial court may deny the instruction. (*Austin*, 133 Ill. 2d at 125, 549 N.E.2d at 334.) Even where "some evidence" of provocation exits, however, the instruction will be denied where the law does not recognize the submitted evidence of provocation as being reasonable and adequate (*Austin*, 133 Ill. 2d at 125, 549 N.E.2d at 334) or where defendant's retalia-

tion is out of all proportion to the provocation (*Austin*, 133 Ill. 2d at 126-27, 549 N.E.2d at 335).

In this case, the second-degree murder statute requires us to focus on the interaction between defendant and Jacob Bulthius. As the second-degree murder statute indicates, the defendant must be "acting under a sudden and intense passion resulting from serious provocation *by the individual killed.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 9—2.) Here, the record is devoid of evidence that Jacob Bulthius ever provoked defendant or that defendant's deadly response was an appropriate amount of retaliation. The only State's witness who could specifically illuminate how the fight started was Michael Bulthius. He testified that he, his brother and father were jumped from behind as they walked back to the car. He was then held by two Villegas brothers and beaten by a third with a pool cue. He then broke away and ran down an alley with two Villegas brothers in pursuit. As for the State's other witnesses, their testimony does not reflect how the fight started. We note, however, the State's witnesses are consistent that after the fight started, the witnesses watched "people swing and run and punch all over the place."

The defendant's evidence can be summarized as asserting that Michael Bulthius started the fight by punching Francisco Villegas. Significantly, however, these witnesses do not offer any other physical, aggressive behavior by Jacob Bulthius. Indeed, no testimony exists that Jacob Bulthius ever fought back or carried weapons, or that any of the Villegases suffered any injury at the hands of Jacob Bulthius. The short of the matter is that there is simply no evidence illuminating the conduct of Jacob Bulthius immediately prior to or during the fight.

It is worth noting that the absence of evidence in this case relating to Jacob Bulthius' involvement is due in large part to the defense posture of this case. All defense witnesses testified consistent with a theory of misidentification, rather than a theory involving sudden and intense passion. The thrust of defendant's case was that defendant briefly fought with Michael Bulthius, chased him down an alley and then proceeded home. Any stabbing that did occur was committed by Gonzolo Villegas while defendant was far removed from the scene. Indeed, defendant's testimony makes no mention of defendant having any contact whatsoever with Jacob Bulthius.

We recognize that a defendant is entitled to have the jury instructed on inconsistent theories of defense where there is some evidence to support each theory. (*People v. Robinson* (1989), 189 Ill.

App. 3d 323, 349, 545 N.E.2d 268, 286.) In this case, however, defendant's defense posture emphasized his absence from the scene of the crime rather than how he reasonably responded to Jacob Bulthius' provocation. Paradoxically, one result of this defense posture is that there is an utter absence of testimony concerning Jacob Bulthius' actions in this case.

Defendant contends that an instruction was required in this case because evidence exists to show that the Bulthiuses and Villegases engaged in mutual combat. We disagree. While defendant correctly asserts that evidence of mutual combat is sufficient to require an instruction to the jury on voluntary manslaughter due to serious provocation (see, *e.g., Austin,* 133 Ill. 2d at 125, 549 N.E.2d at 334), we conclude that mutual combat, as the phrase has been defined, did not occur here. Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. *Austin,* 133 Ill. 2d at 125, 549 N.E.2d at 334.

Here, the evidence merely shows that a fight broke out between two families during which Jacob Bulthius was stabbed. Absent evidence demonstrating the circumstances surrounding the deceased's involvement in the fight, we cannot determine whether Jacob and defendant's quarrel was "sudden," "in hot blood," or upon "equal terms." Accordingly, absent "some evidence" that a second-degree murder instruction was appropriate here, the trial court properly concluded that no such instruction was required.

■■ Defendant's final issue is that he was improperly convicted of both armed violence and murder where both convictions are based on the same underlying violent act. The State agrees that the armed violence conviction should be vacated. Accordingly, we vacate defendant's armed violence conviction. See *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.

For the foregoing reasons, the judgment of the circuit court of ·Cook County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

CAMPBELL and O'CONNOR, JJ., concur.