THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY PARKER, Defendant-Appellant.

Fifth District   No. 5—89—0370

Opinion filed May 26, 1992.—Rehearing denied July 8, 1992.

CHAPMAN, J., specially concurring.
HARRISON, J., dissenting.

Daniel M. Kirwan and John T. Hildebrand, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles Grace, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Larry Parker, was found guilty of first-degree murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), two counts of aggravated battery in violation of section 12—4(a) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a)), and unlawful use of weapons by a felon in violation of section 24—1.1 of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 24—1.1).

On appeal defendant contends (1) he was denied a fair trial by the State's prejudicial use of inadmissible hearsay, (2) he was denied a fair trial by the State's introduction of a prejudicial autopsy photograph of

the decedent, (3) he received ineffective assistance of counsel, and (4) one conviction for aggravated battery must be vacated because both convictions are based upon the same physical act. We affirm in part and vacate in part.

Defendant was charged with three counts of first-degree murder for the death of his former girl friend, Estella Day, two counts of aggravated battery for shooting Leslie Mosley in the hip, and one count of unlawful use of weapons by a felon for knowingly and unlawfully possessing a .38 caliber handgun after having been convicted of a felony in the State of Illinois. A jury trial commenced February 14, 1989, at which time the following facts were adduced.

In the early morning hours of July 2, 1988, 28-year-old Estella Day traveled to Kousin's Riverside Klub (Kousin's), a Murphysboro tavern, with Donald Stewart. Upon their arrival, Day saw a friend, Catherine Martin, who came over and sat in Stewart's car with Day and Stewart for a brief period before going inside the bar. While Day, Stewart and Martin were conversing in Stewart's car, defendant came around the side of the building and Day called to him. Defendant testified that he and Day had been dating for approximately three years and were still involved in a relationship on July 2, 1988. Day's mother, Sharon Day, and Catherine Martin testified that defendant and Day broke up several months prior to that date.

Defendant approached the car and Martin went inside Kousin's. Day introduced defendant to Stewart and then exited the car to speak with defendant for 10 to 15 minutes. Defendant testified that Day warned him to "be careful because Stewart was carrying a piece." There was no evidence presented as to why Stewart would want to harm defendant. After the conversation with Day, defendant went inside Kousin's. Day and Stewart entered the bar shortly thereafter, and Day and defendant were seen talking by the bar for several minutes before separating to talk to other patrons. Defendant testified that Day again warned him to be careful because Stewart was armed. At approximately 3:30 a.m., Stewart, Day and defendant met on the parking lot outside Kousin's. Evidence showed that Day was standing directly in front of defendant, at a distance of two to four feet from defendant, and Stewart was behind and slightly to the right of Day at a distance of approximately 7 to 10 feet from defendant. Defendant testified that Stewart was wearing a bulky jacket and he saw Stewart reach inside the jacket for what defendant believed to be a gun. There is no evidence that Stewart had a weapon of any kind. Defendant then pulled his own concealed .38 caliber revolver and fired two shots. The first shot struck Day in the head, entering just above and behind

her left ear. The second shot hit another patron, Leslie Mosley, in the hip. Stewart testified that he did not possess a weapon on July 2, 1988, and no other witnesses saw him with a weapon at any time that morning. After shooting Day and Mosley, defendant left the parking lot and saw Mark Hunter stopped at an intersection. Defendant approached the car and asked Hunter to take him to his father's residence in Carbondale. Hunter assented and defendant entered the back seat. Another passenger, Carolyn Gaston, was in the front seat. Hunter testified that defendant said, "I fucked up. I got to get over to Carbondale to my father's house." Gaston testified that although she had been drinking, she remembered defendant saying something like, "I know they're going to be all over the place," but not knowing to whom defendant was referring. Hunter then drove defendant to Carbondale and dropped him off at his father's residence, a senior citizens apartment complex. Before exiting the car, defendant asked Hunter to take him to a friend's house instead, but Hunter refused. Defendant then went inside the building, put the gun which belonged to his father, Joe McCorkle, under a pillow, and left the building. He was picked up outside his father's residence by Carbondale police officer Harold Tucker and taken into custody. Defendant was subsequently charged and convicted of first-degree murder for the death of Estella Day, aggravated assault for the shooting of Leslie Mosley, and unlawful use of weapons by a felon.

Defendant's first contention on appeal is that he was denied a fair trial by the State's prejudicial use of inadmissible hearsay evidence. Near the end of its case, the State called defendant's father, Joe McCorkle, to testify. The State was aware of a conversation that took place between defendant and McCorkle on July 2, 1988, while defendant was in custody, during which defendant made a statement implying that the shooting of Day was intentional. McCorkle repeated defendant's statement to Detective Robert Burns later that same day. When the State called McCorkle to testify to what defendant had told him, however, McCorkle testified as follows:

"Q. Did your son, Larry Parker, telephone you on July 2, 1988?

A. Call me? No. I ain't told nobody that. Larry didn't call me July 2. Like I say, he was there July 2. Why should he call me?

Q. Did he call you in the afternoon of July 2?

A. Later on, maybe, yes. Later on, but it was near dark then or dark. That was still July the second, though.

* * *

Q. What did your son tell you on the telephone when he spoke to you?

A. Oh, I don't know. Ain't no need of—You trying to make me lie. ***

* * *

Q. During your conversation on July 3, 1988, did you tell Detective Burns what your son had told you?

* * *

A. No, I wouldn't tell him—I don't have to answer, do I?"

Thereafter, the State recalled Detective Burns as an impeachment witness. Burns testified as follows:

"Q. And in the afternoon hours of July 2, 1988, did you have a telephone conversation with Joe McCorkle?

A. Yes, sir, I did.

Q. What time of the day was that?

A. It was 5:20 p.m.

Q. And what was the purpose for calling Mr. McCorkle?

A. To speak with him about information that we had received from him earlier.

Q. During the conversation that you had with him in that phone call, did he indicate to you that he had an earlier phone conference with Larry Parker, his son?

A. Yes, he did.

Q. And what did he indicate to you was the nature of the earlier phone conference with his son, Larry Parker?

* * *

A. He indicated that when he spoke with Larry, he asked Larry what had made him do such a thing and Larry had made the remark that it was a long story, but that she had been messing him over for a long period of time, and that he had put a stop to it.

Q. Was that phone conference that he referred to earlier that day on July 2, in the afternoon of July 2?

A. Yes, sir."

Immediately following Burns' testimony, the court instructed the jury that his testimony was to be considered only as impeachment of McCorkle's testimony and must not be considered as proving the truth of defendant's statement about which Burns testified. The jury was given a similar instruction at the end of trial.

■ The governing principle of law states: "A *** witness *** cannot be impeached by [a] prior inconsistent statement[ ] unless his

testimony has damaged, rather than failed to support the position of the impeaching party." (*People v. Weaver* (1982), 92 Ill. 2d 545, 563, 442 N.E.2d 255, 262.) Therefore, the first issue before us is whether McCorkle's testimony damaged the State's case or whether it failed to support the State's position. Defendant argues that McCorkle's testimony merely failed to add something desired by the State, and the State's case was not damaged. We disagree. The State's purpose in calling McCorkle as a witness was to elicit testimony tending to show that defendant intentionally killed Day, a key element in the State's case. The State correctly asserts that had McCorkle testified to the statement defendant made to him, the contents of defendant's statement would have been admissible as substantive evidence of an admission. (*People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592; *People v. Prante* (1986), 147 Ill. App. 3d 1039, 498 N.E.2d 889.) However, McCorkle denied defendant made the admission, denied repeating defendant's statement to Detective Burns, and indicated that the State was fabricating the incident by accusing the State's Attorney of trying to make him lie.

The level of damage necessary to allow impeachment testimony was stated by the *Weaver* court: "It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." (92 Ill. 2d at 563-64, 442 N.E.2d at 262-63.) It is clear to this court that McCorkle's testimony was more damaging to the State than his complete failure to testify would have been. McCorkle failed to support a single element of the State's case, and he suggested improprieties by the State, that the State fabricated information and tried to recruit his participation in such fabrication. We find that McCorkle's testimony damaged the State's credibility, an essential element in any case. Therefore, the *Weaver* test has been met.

Defendant argues that the case at bar is remarkably similar to *People v. Johnson* (1985), 138 Ill. App. 3d 980, 486 N.E.2d 433, in which this court held that impeachment of a prosecution witness was impermissible. In *Johnson*, the defendant allegedly confessed to a cellmate, Dewayne Davis, who repeated the defendant's statements to police investigator Edward Tolbert. When the State called Davis to testify, he denied ever having knowledge of the defendant's alleged confession. The State then called Investigator Tolbert to rebut Davis' testimony by eliciting testimony that Davis told him of a conversation with the defendant whereby the defendant made several admissions of guilt. This court, following *Weaver*, held that Davis' testimony did not damage or contradict the State's case. (138 Ill. App. 3d at 985, 486

N.E.2d at 437.) We perceived no possible purpose for impeaching Davis except to bring inadmissible hearsay to the jury's attention, and we concluded that Tolbert's testimony was impermissible. 138 Ill. App. 3d at 985, 486 N.E.2d at 437.

Although factually similar, *Johnson* is distinguishable from the case before us. As we have already discussed, McCorkle's testimony damaged the State's credibility and position in the case at bar, whereas Davis' testimony merely failed to support the State's case in *Johnson*. Therefore, we affirm the trial court's decision to allow impeachment testimony by Officer Burns, a conclusion not inconsistent with our holding in *Johnson*.

We next address defendant's contention that the State's introduction of an autopsy photograph of the decedent inflamed and prejudiced the jury. The photograph defendant objects to depicts a portion of the decedent's head with the scalp peeled back, showing the location of the bullet lodged in decedent's skull. Defendant argues that the photograph was irrelevant to establish any material facts in the case because the following issues were not disputed: (1) cause of death; and (2) defendant fired the fatal shot. Defendant maintains that the final location of the bullet after it traveled through the decedent's head was not probative, so the only purpose served by the photograph was to inflame the jury against defendant.

■ Photographs of a murder victim are admissible into evidence regardless of their gruesome nature if they are relevant to establish any material fact in the case. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) The general rule is that the decision to admit photographs into evidence lies in the sound discretion of the trial judge. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) We have reviewed the photograph and do not believe the trial court abused its discretion by permitting the jury to see it. The photograph corroborates testimony as to the cause of death and location of the wound; it helps negate defendant's defense that although he was standing two to four feet from the decedent, he accidentally shot her squarely in the head. We therefore affirm the trial court's decision to admit the autopsy photograph depicting the location of the bullet in the decedent's head.

Defendant next contends that he received ineffective assistance of counsel in that trial counsel failed to request a transferred-intent instruction and an involuntary manslaughter instruction and failed to object to the State's closing arguments.

In *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, our supreme court adopted the principles concerning ineffective assistance

of counsel as established by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive the defendant of a fair trial. (*Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255.) Defendant must also establish that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. 104 Ill. 2d at 525, 473 N.E.2d at 1255.

Defendant first argues that his representation was incompetent because counsel failed to tender a jury instruction on the doctrine of transferred intent and failed to argue transferred intent during closing arguments. We have consistently held that where a person without legal justification or excuse shoots at one individual and inadvertently kills another, he is guilty of the same degree of unlawful homicide as if he had killed the object of his aim. (*People v. Johnson* (1978), 66 Ill. App. 3d 84, 383 N.E.2d 648; *People v. Adams* (1972), 9 Ill. App. 3d 61, 291 N.E.2d 54.) The State argues that the jury was, in fact, made aware of the doctrine of transferred intent with regard to the first-degree-murder offense when the court issued Illinois Pattern Jury Instruction, Criminal 2d, No. 7.01:

> "A person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which cause the death,
>
> (1) he intends to kill or do great bodily harm to that individual *or another*;
>
> or
>
> (2) he knows that such acts will cause death to that individual *or another*;
>
> or
>
> (3) he knows that such acts create a strong probability of death or great bodily harm to that individual *or another* ***." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 7.01 (2d ed. 1981).

Contrary to defendant's argument, defense counsel did refer to the doctrine of transferred intent to exonerate defendant during closing argument:

> "If I can make an analogy here, if this were a police officer and he believed that this individual, Donald Stewart, was armed or he had been told by a couple people that 'this man is armed and dangerous and you better watch out' and the police officer

saw Donald Stewart coming around the parking lot, reach for his waistband and saw what he thought may have been a gun and the police officer pulled his weapon and fired and, in the process, caught Estella Day, we wouldn't be here. The law is the same."

The doctrine of transferred intent was not completely ignored by defense counsel or the court. Although defense counsel failed to request a specific instruction on the transferred-intent doctrine, defendant cites no authority, and we find none, indicating that such an omission constitutes ineffective assistance of counsel. Additionally, this court finds that such an omission does not fall below the objective standard of reasonableness mandated by *People v. Albanese*.

Defendant next argues that he received incompetent representation because counsel failed to tender an involuntary manslaughter instruction. Defendant asserts that he was entitled to such an instruction because the jury could have concluded that defendant unintentionally killed Day but that his acts displayed a reckless and unjustified disregard for Day's life. Involuntary manslaughter is defined as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." (Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a).)

In support of his argument, defendant cites two cases, *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984, and *People v. Adams* (1972), 9 Ill. App. 3d 61, 291 N.E.2d 54. The *Santiago* court held that if there is some evidence in the record which would reduce the crime to involuntary manslaughter, defendant is entitled to an instruction defining the lesser offense. (*Santiago*, 108 Ill. App. 3d at 802, 439 N.E.2d at 994.) The defendant in *Santiago* fired a gun in the general direction of a parked car. One of the bullets struck David Pifer, who later died from his injuries. The defendant was convicted of voluntary manslaughter. The court held that under the facts of that case defendant was entitled to an involuntary manslaughter instruction. (108 Ill. App. 3d at 803, 439 N.E.2d at 995.) In reaching this conclusion, the court noted there was no evidence that anyone was standing near the car when the defendant opened fire. (108 Ill. App. 3d at 803, 439 N.E.2d at 995.) The case before us is distinguishable from *Santiago* in that defendant in the present case admitted that when he fired the gun, he intended to shoot Donald Stewart. That admitted intent is

absent from *Santiago*, making it factually inapposite to the case at bar.

*People v. Adams* is also factually distinct. The defendant in *Adams* was fired upon by an assailant sitting in a car. In self-defense, defendant returned the assailant's fire with several bullets from his own gun, striking the assailant. At least one of the defendant's bullets traveled through the assailant and struck a woman sitting next to him. The woman subsequently died of her injuries, and the defendant was convicted of involuntary manslaughter for the woman's death. The issue on appeal was whether a defendant can be found guilty of involuntary manslaughter of a third person unintentionally killed by him while defending himself against an unlawful attack by another. The narrow holding reached by the *Adams* court was that the defendant committed no crime:

> "He had to act immediately to protect himself from a man who had been drinking all day and who was not just threatening him but was shooting at him. Even under such circumstances defendant did not shoot wildly or carelessly. From the record it can be inferred that he hit his assailant with every shot and that the innocent victim was killed only as a result of a bullet passing through the body of the assailant." (*Adams*, 9 Ill. App. 3d at 64, 291 N.E.2d at 56.)

Clearly, the circumstances in *Adams* under which the defendant fired his weapon are completely different than the circumstances under which defendant in the present case fired his weapon. The fact-specific holding in *Adams* has no application here.

Looking beyond the case law defendant provides, we do not find any authority to support defendant's contention. Upon defense counsel's request, the court issued a voluntary manslaughter instruction to the jury, in addition to the first- and second-degree-murder instructions. The jury returned a verdict that defendant was guilty of first-degree murder, a conviction far removed from involuntary manslaughter or even voluntary manslaughter. Assuming, *arguendo*, that defense counsel's failure to tender an involuntary manslaughter instruction was an error, it does not rise to the level of incompetence required for a judgment of ineffective assistance of counsel. As stated earlier, under *Albanese*, defendant must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. We find no such probability exists here, and defense counsel's failure to tender an involuntary manslaughter instruction does not constitute ineffective assistance of counsel.

■ Defendant's next complaint regarding his representation lies with defense counsel's failure to object to comments made by the State during closing argument. Defendant cites several instances where defense counsel should have objected during the State's closing argument, contending that counsel's failure to do so amounts to ineffective assistance of counsel. Upon review of the record, we find no such error.

■ The final issue on appeal is whether one of defendant's convictions for aggravated battery must be vacated. According to *People v. Ellis* (1986), 143 Ill. App. 3d 892, 493 N.E.2d 739, multiple convictions for aggravated battery cannot stand when a single physical act is the basis for both offenses. Defendant was convicted of two counts of aggravated battery for the shooting of Leslie Mosley, a single physical act, so this court will vacate one of the aggravated battery convictions.

For the foregoing reasons, the judgment of the circuit court of Jackson County finding defendant guilty of first-degree murder, aggravated battery and unlawful use of weapons by a felon is affirmed, and the second conviction of aggravated battery is vacated.

Affirmed in part, vacated in part.

JUSTICE CHAPMAN, specially concurring:

While I agree with Justice Harrison's dissenting opinion that under *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255, and *People v. Johnson* (1985), 138 Ill. App. 3d 980, 486 N.E.2d 433, the impeachment of McCorkle was improper, I do not agree that the error mandates reversal in this case.

Mr. McCorkle was in his eighties and almost blind. As the court indicated:

"Now, Mr. McCorkle says he does not remember. The man is 81 years old, Mr. Wepsiec.
        * * *
        * * * You are asking him compound questions. You are not being specific in your questions. You are asking him open-ended questions. And I think it's very unfair. I think it's extremely unfair."

And later:

"I don't think he is a hostile witness. I think the man doesn't remember, Mr. Grace, legitimately doesn't remember * * *."

In contrast to the possible confusion involved in McCorkle's testimony, there was specific, albeit controverted, testimony from 24-year-

old Catherine Martin that a week or two before the killing the defendant had sort of wrestled with and slapped the victim in the face while trying to wake her up. When the victim argued with him, he had picked up a gun, pointed it at her, and said, "I will kill you." In view of Catherine Martin's testimony I conclude that the trial court's action with respect to the impeachment of McCorkle does not warrant reversal, and I, therefore, concur with the result reached by Justice Goldenhersh.

JUSTICE HARRISON, dissenting:

I decline to join in Judge Goldenhersh's opinion because I do not agree that Mr. McCorkle's testimony damaged the State's case so as to make impeachment permissible. The following are further excerpts from Mr. McCorkle's testimony at trial:

"Q. What did your son tell you on the telephone when he spoke to you?

A. Oh, I don't know. Ain't no need of—You trying to make me lie. I don't know what Larry said, not that long ago. In fact, I don't know. I think he said he was in jail. I don't know.

\* \* \*

Q. Sir, did your son, in the course of his telephone conversation with you, tell you that it was a long story, but that she had been messing—

MR. VAN DERHOFF: Your Honor, I am going to object. The witness has already testified he didn't recall what was said in the conversation.

THE COURT: Sustained.

\* \* \*

Q. Isn't it a fact, Mr. McCorkle, that on July 2, 1988, at approximately 5:20 p.m., you were contacted by Officer Robert Burns of the Jackson County Sheriff's Department by telephone?

A. By telephone? I don't remember whether that's right or not.

MR. WEPSIEC: Your Honor—

A. He might have called me, yes, but like I say, I don't remember him calling me.

MR. WEPSIEC: Your Honor, pursuant to S[upreme] Court Rule 238, I would ask that Mr. McCorkle be labeled a hostile witness.

THE COURT: Denied.

MR. WEPSIEC: I would ask—

THE COURT: It's obvious, Mr. Wepsiec, that the gentleman cannot remember what was said to him, if his son called him on July 2 or 3.

Q. Mr. McCorkle, do you remember speaking with Detective Burns on July 2, 1988, on the telephone?

A. What did you say?

* * *

THE COURT: He wants to know, Mr. McCorkle if you talked with Detective Burns on the telephone, not in person, but on the telephone on July 2, 1988?

A. Well, I don't recall talking to him on no telephone, no."

When considered in its entirety, the testimony of Mr. McCorkle does not, as Judge Goldenhersh suggests, damage the State's credibility by implying that the State was attempting to fabricate evidence. Rather, the testimony simply shows that Mr. McCorkle could not remember the conversations about which the State was questioning him and did not want to be pressured into saying he recalled something when he clearly did not. Indeed, the trial court, in proceedings held outside the jury's presence, stated its belief that Mr. McCorkle was not attempting to impair the State's case:

"THE COURT: Now, Mr. McCorkle says he does not remember. The man is 81 years old, Mr. Wepsiec.

MR. WEPSIEC: I realize that, your Honor.

THE COURT: You are asking him compound questions. You are not being specific in your questions. You are asking him open-ended questions. And I think it's very unfair. I think it's extremely unfair.

MR. WEPSIEC: I can ask him leading questions, if the Court would permit me, your Honor.

THE COURT: I will ask you—I will allow you to ask the man leading questions, but you have asked him all these questions. You obviously have him confused, and he's told you he did not talk with his son on the phone, or, at least, he did not remember talking to him.

* * *

MR. GRACE: And, Your Honor, at this point in time, I believe we have established sufficient indication at this point of a hostile witness under [Rule] 238.

THE COURT: I don't think he is a hostile witness. I think the man doesn't remember, Mr. Grace, legitimately doesn't remember, but I will allow you to ask him leading questions."

Therefore, because I believe that, as in *People v. Johnson* (1985), 138 Ill. App. 3d 980, 486 N.E.2d 433, there was no possible purpose for impeaching the witness except to bring inadmissible hearsay to the jury's attention, the impeachment testimony of Detective Burns was impermissible. Since admissions are almost always potent evidence of guilt, I find that the error was not harmless. Accordingly, I would reverse and remand for a new trial. See *Johnson*, 138 Ill. App. 3d at 986, 486 N.E.2d at 437.